**SBAITI & COMPANY PLLC**
MAZIN A. SBAITI
CA Bar No. 275089
Email: mas@sbaitilaw.com
Dallas Arts Tower
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
P: (214) 432-2899
F: (214) 853-4367

**SBAITI & COMPANY NJ LLC**
MATTHEW B. SICHERI
NJ Bar No. 256102018 (*Pro Hac Vice*)
Email: Matthew.Sicheri@SbaitiLaw.com
100 Mulberry Street,
3 Gateway Center, Suite 1102
Newark, New Jersey 07102
P: (973) 954-2000
F: (973) 954-9710

*ATTORNEYS FOR PLAINTIFF*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY VICTIM, a Sex Trafficked Individual, <br><br> *Plaintiff,* <br> v. <br><br> G6 HOSPITALITY PROPERTY LLC, ET AL, <br> *Defendants.* | **Case No. 5:24-cv-2350-AH-DTB** <br><br> **FIRST AMENDED COMPLAINT** <br><br> 1) **18 U.S.C. § 1595 *et seq*.** <br> 2) **18 U.S.C. § 2421 *et seq*.** <br> 3) **California Civil Code § 52.5** <br> 4) **Intentional Infliction of Emotional Distress** <br> 5) **Negligent Infliction of Emotional Distress** <br> 6) **Negligence** <br><br> **DEMAND FOR JURY TRIAL** |

1

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

# I.

## **PRELIMINARY STATEMENT**

Plaintiff Jenny Victim respectfully brings this case for damages against Defendants who were instrumental, if not necessary, participants in a sex trafficking venture that took away nearly twenty years of her life.

This case is about the horrors Plaintiff had to endure as she was forced into a life of involuntary sexual servitude, violence, and drugs at the tender age of fifteen. After being trafficked by someone supposedly charged with protecting her, she was thrust into the hands of a notorious sex trafficker, Tom Roe, and his accomplices and associates.

Tom Roe persistently threatened, intimidated, defrauded, manipulated, drugged, and manhandled Plaintiff to keep her in the sex trade. And when she tried to leave, he tracked her down and assaulted her—threatening her not to leave again. Tom Roe's decades-long exploitation of Plaintiff would not have been possible without the available network of hotels and motels who willingly participated by providing the place and opportunity for her near-daily exploitation.

Other perpetrators of and participants in these crimes will be held to account in different ways and in different fora.  This case is about the hotel and motel owners knowingly profiting from a sex trafficking venture with Tom Roe and his associates. Defendants were aware of what was happening; yet they knowingly turned a blind eye to the realities because it was in their financial interests to do so.

# II.

## **THE PARTIES**

1.    Plaintiff JENNY VICTIM is a citizen of California. Due to the sensitive, private, and demonstrably retaliatory nature of the allegations contained herein, Plaintiff requests this District Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym and to ensure Defendants keep

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

Plaintiff's identity confidential throughout the pendency of the lawsuit and thereafter.[1] Plaintiff also intends to file a formal motion to proceed under a pseudonym after completing service of the Amended Complaint on Defendants so as to determine whether the Defendants would oppose Plaintiff's request to proceed under a pseudonym.

2.     Defendant EL MONTE HOSPITALITY LLC D/B/A MOTEL 6 EL MONTE was a hotel venture located at 3429 Peck Rd, El Monte, California 91731. Upon information and belief, at all relevant times it was owned and operated by Defendant El Monte Hospitality LLC. It can be served with process via any legal means for service of process.

3.     Defendant G6 HOSPITALITY LLC D/B/A MOTEL 6 POMONA is or was a hotel venture located at 2470 S. Garey Avenue, Pomona, California 91766. Upon information and belief, at most or all relevant times, it was owned and operated by Defendant G6 Hospitality LLC. G6 Hospitality LLC is a Delaware limited liability company headquartered at 4001 International Parkway, Carrollton, Texas 75007, and is the owner and franchisor of the Motel 6 and Studio 6 brands in the United States and Canada, with around 1,500 locations. It both owns certain locations and franchises others. It offers property management, call center, distribution, reservations, marketing, sales, procurement, and training expertise to its proprietary locations and to its franchisees and employees.

4.     Defendant G6 HOSPITALITY PROPERTY LLC D/B/A MOTEL 6 SAN BERNARDINO was a hotel venture located at 1960 Ostrems Way, San Bernardino, California 92470, from about 2012 to 2022. Upon information and belief, G6 Hospitality

---

[1] Tom Roe and his associates trafficked Plaintiff as both a minor and as an adult from approximately May 2004 through December 2021. In addition to being a victim of a "severe form[] of trafficking" as it is defined under 22 U.S.C.S. §7102(11), Plaintiff was also "caused to engage in commercial sex act[s]" before she attained the age of 18 and for years thereafter. *See* 18 U.S.C.S. §1591(a). Federal law considers victims of sex trafficking to be the victims of organized crime entitled to witness protection. *See* 18 U.S.C. § 1594(g) ("Witness Protection - Any violation of this chapter shall be considered an organized criminal activity or other serious offense for the purposes of application of chapter 224"). In cases where the Plaintiff has demonstrated a need for pseudonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b) and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c) to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1068 (9th Cir. 2000) (recognizing the Ninth Circuit permits parties to use pseudonyms when disclosure of a name "is necessary…to protect a person from harassment, injury, ridicule or personal embarrassment); *Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990 (N.D. Cal. 2015) (finding that a case involving exotic dancers because of the social stigma of such acts met the standards set by the Ninth Circuit to proceed under a pseudonym).

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

Property LLC is a Delaware limited liability company headquartered at 4001 International Parkway, Carrollton, Texas 75007. It owns and operates Motel 6 and Studio 6 hotels like Motel 6 San Bernardino.

5.      Defendant MOTEL 6 OPERATING L.P. D/B/A MOTEL 6 SAN BERNARDINO was a hotel venture located at 1960 Ostrems Way, San Bernardino, California 92470, from about 2012 to 2022. Upon information and belief, Motel 6 Operating L.P. is a Delaware limited partnership headquartered at 4001 International Parkway, Carrollton, Texas 75007. It owns, operates, and franchises Motel 6 and Studio 6 hotels, and provides vacation home rentals, B&Bs, and other services.

6.      Defendant SB HOTEL NORTH LLC D/B/A MOTEL 6 SAN BERNARDINO was a hotel venture located at 1960 Ostrems Way, San Bernardino, California 92470. Upon information and belief, SB Hotel North LLC is a California limited liability company headquartered at 1960 Ostrems Way, San Bernardino, California 92470. It may be served at its place of business or via its registered agent, Harshana Patel, at 3666 Pio Pico Drive, Carlsbad, California 92008.

7.      Defendant MOTEL 6 OPERATING L.P. D/B/A MOTEL 6 CHINO is or was a hotel venture located at 12266 Central Avenue, Chino, California 91710, from about 2012 to 2019. Upon information and belief, Motel 6 Operating L.P. is a Delaware limited partnership headquartered at 4001 International Parkway, Carrollton, Texas 75007. It owns, operates, and franchises Motel 6 and Studio 6 hotels, and provides vacation home rentals, B&Bs, and other services.

8.      Defendant 5710 LA PALMA L.P. D/B/A STUDIO 6 ANAHEIM HILLS is or was a hotel venture located at 5710 E. La Palma Avenue, Anaheim, California 92807, from about 2018 to 2021. It may be served through its Registered Agent, Chris Cachat, at 11211 Hunting Horn Drive, Santa Ana, California 92705.

9.      Defendant, ANAHEIM INVESTMENT INC. D/B/A STUDIO 6 ANAHEIM HILLS is or was a hotel venture located at 570 E. La Palma Avenue, Anaheim, California 92807 from about 2021 through present.  It may be served through its Registered Agent,

4

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

Miteshkumar Ahir, at 1104 W. Pacific Coast Highway, Wilmington, California 90744, or at 5710 E. La Palma Avenue, Anaheim, California 92807.

10.    Defendants, PRASHANT R. VAGHASHIA and MITA P. VAGHASHIA D/B/A ECONO-INN – ONTARIO, CALIFORNIA, are or were a hotel venture located at 724 S. San Antonio Avenue, Ontario, California 91762. It is currently owned by PNM Ontario LLC.  Defendants Prashant R. Vaghashia and Mita P. Vaghashia can be served at 3339 Durham Court, Burbank, California 91504, or anywhere they may be found.

11.    Defendant JAYESHBHAI S. SHAH D/B/A AMERICAN INN is or was a hotel venture located at 755 North Euclid Avenue, Ontario, California 91762. He may be served wherever he may be found.

12.    Defendant SOL HOSPITALITY GROUP LLC D/B/A BAYMONT INN BY WYNDHAM is a hotel venture located at 1655 E. 4th Street, Ontario, California 91764. Upon information and belief, SOL Hospitality Group LLC can be served at its address, 1655 E. 4th Street, Ontario, California 91764, or via any legal means available for service of process.

13.    Defendant SOL HOSPITALITY GROUP LLC D/B/A ECONO LODGE is a hotel venture located at 1655 E. 4th Street, Ontario, California 91764. Upon information and belief, SOL Hospitality Group LLC can be served at its address, 1655 E. 4th Street, Ontario, California 91764, or via any legal means available for service of process.

14.    Defendant BALGOPAL INVESTMENTS INC. D/B/A RAMADA BY WYNDHAM is or was a hotel venture at 1841 E. G Street, I-10, Ontario, California 91764. Its principal place of business and headquarters are located at 2609 Forest Ridge Boulevard, Hernando, Florida 34442, and may be served there or wherever it may be found or legally served.

15.    Defendant, GROVE HOSPITALITY LLC D/B/A COUNTRY INN-ONTARIO is or was a hotel venture located at 2359 South Grove Avenue, Ontario, California 91761, from about 2010 to 2011. Upon information and belief, Grove Hospitality LLC may be served through its Registered Agent, Veno Nathraj, or other corporate officer

5

at 231 N. Vineyard Avenue, Ontario, California 91764, or wherever it may be found or legally served.

16.    Defendants ANGELA WU SHUYU (SHUYU ANGELA WU) and K&A GLOBAL INVESTMENT LLC D/B/A COUNTRY INN are or were a hotel venture located at 2359 South Grove Avenue, Ontario, California 91761, from about 2011 to 2014. They may be served at 4781 Sepulveda Boulevard, Sherman Oaks, California 91403, or wherever they may be found or legally served.

17.    Defendant WEST COAST INN - ONTARIO, CALIFORNIA was a hotel venture located at 1211 N. Grove Avenue, Ontario, California 91764. Its principal(s) are currently unknown ABC Corporation(s) or ROE individuals.

18.    Defendant CHOICE HOTELS INTERNATIONAL, INC. owns the Econo Lodge brand. It may be served at 915 Meeting Street North, Bethesda, Maryland 20852, or via any legal means for service of process.

19.    Defendant WYNDHAM HOTELS AND RESORTS, INC. owns the Wyndham Hotels brand and Ramada Hotels brand. Wyndham may be served at its principal place of business located at 22 Sylvan Way, Parsippany, New Jersey 07054, or via any legal means available for service of process.

20.    Defendant RAMADA INTERNATIONAL INC. is, upon information and belief, is a company and brand owned by Wyndham Hotels.  Ramada International Inc. may be served at its principal place of business located at 22 Sylvan Way, Parsippany, New Jersey 07054, or via any legal means available for service of process.

21.    Defendants ABC CORPORATIONS 1-100 and JOHN ROES 1-100 are currently unknown. The true names and capacities of the Defendants ABC Corporations 1-100 or JOHN ROES 1-100 are unknown to Plaintiff at the time of filing this Amended Complaint, and Plaintiff, therefore, sues said Defendants by such fictitious names and will ask leave of court to amend this Amended Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes, and therefore alleges, that each of the ABC Corporations and John Roe Defendants are, in some manner,

6

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

responsible for the events and happenings herein set forth and proximately caused injury and damages to Plaintiff as herein alleged.

## III.

## JURISDICTION & VENUE

22.     This Court has original and supplemental subject matter jurisdiction over this matter under 28 U.S.C. § 1331, 18 U.S.C. § 1595(a), and 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over all Defendants because they are citizens of California or regularly conduct business in California, and because their acts or omissions that occurred in California gave rise to the causes of action asserted herein.

24.     Venue is proper in this District because Plaintiff was trafficked in this District, the acts giving rise to this action occurred in this District, and Plaintiff and each Defendant are domiciled in this District or regularly conduct business in this District.

## IV.

## BACKGROUND FACTS

25.     This case bespeaks a tragedy that must be remedied.

26.     As a young teenager, Plaintiff was sex trafficked by a prominent community member under the guise of taking care of her. He then handed her off at the age of 15 to Tom Roe, a known sex trafficker and organized crime member.

27.     Over the nearly two decades since, Plaintiff was trafficked in the State of California by Tom Roe and his affiliates and associates, who forced her to perform commercial sexual acts under coercion and threat of mental, bodily, and physical injury from the tender age of 15 and well beyond the age of majority. They would not have been able to do so without the knowing, substantial assistance of the Hotel Ventures identified here.

**A. THE HORRIFIC ORDEAL AT DEFENDANTS' HOTEL VENTURES (FACTS COMMON TO ALL DEFENDANTS)**

28.     Plaintiff's disturbing journey began when she was a young teenager and continued into adulthood. From about 2002 through late 2006 when Plaintiff was a minor, Tom Roe and his affiliates forced her to have sex with strange men for money in the hotels

7

and motels in California named as Defendants in this action.

29.    Plaintiff's disturbing journey continued into adulthood from late 2006 through 2022, where Tom Roe and his associates continued to force Plaintiff to have sex with strange men for money in the hotels and motels in California named as Defendants in this action.

30.    Plaintiff was first forced into servitude to work for Tom Roe, a known organized crime member and sex trafficker, when she was younger than 16 years old.

31.    Plaintiff was mentally and physically abused when she tried to escape, drugged and threatened with serious physical and mental harm, and threatened that she would go to jail if she did not comply.  At all times Plaintiff believed that if she did not perform the sex acts and generate revenue, she would suffer severe physical harm, mental anguish, psychological harm, reputational harm, financial harm, personal hardship, or consequences of the legal process. At all times, Plaintiff was reasonably afraid she would incur these injuries if she did not comply.

32.    Plaintiff was part of a group of underage girls who were trafficked. Early on in the trafficking, Plaintiff saw what happened to other girls who disobeyed Tom Roe, acted up, or tried to leave. Tom Roe would beat up  any of the girls who he considered disobedient or disrespectful girl in front of the trafficked victims, including Plaintiff, so violently that they would have visible bruises on their legs, backs and arms, and he would frequently give a girl a black eye. Plaintiff knew that if she acted up or tried to leave, she would suffer the same vile consequences.

33.    Beyond the continuous physical abuse, the emotional distress and abuse that Plaintiff was forced to endure as Tom Roe dehumanized her, in view of all, including the Defendants and their agents, servants, and employees, caused the Plaintiff to slowly deteriorate mentally as a means to keep her compliant for the trafficking.

34.    When Tom Roe was concerned that Plaintiff would try to escape, he would make threatening statements to Plaintiff, such as "Do you know who I am? I will find you!" and "If you act up, I will f--- you up!" On many occasions, he threatened to kill Plaintiff if she tried to escape.

8

35.     Tom Roe would drug Plaintiff constantly to gain her compliance—frequently plying her with drugs such as Xanax and fentanyl, and similar such drugs that would cause her to be noticeably mentally incapacitated and easy to control.

36.     Tom Roe would verbally abuse Plaintiff and degrade her in public, including while at Defendants' hotels. His verbal abuse was so frequent that she believed what he said about her was true.

37.     Each of the Defendants in this Amended Complaint substantially participated in Plaintiff Jenny Victim's abuse, whether directly or indirectly, by knowingly or recklessly assisting, supporting, and facilitating the commercial sex acts she was compelled to engage in. Each of the Defendants in this case benefited financially from their participation, knowing or in reckless disregard of the fact that she was being trafficked and compelled into a life of commercial sex servitude.

38.     Each of the Defendants named in this Amended Complaint, including their agents, servants, or employees, permitted the trafficking and abuse, both physical and mental abuse, to continue in reckless disregard of the damage to Plaintiff and the other trafficked women repeatedly sustained in the presence of the Defendants upon their premises, or at a minimum turned a blind eye to it. At some of the locations, the Defendants' agents, servants, or employees specifically witnessed the abuse, the threats from Tom Roe and his associates. And some even accepted Tom Roe's offers to have sex with Plaintiff in exchange for their cooperation.

39.     Tom Roe and his associates—usually two other men—were armed.

40.     Plaintiff and the other girls who were being trafficked by Tom Roe and his associates would travel as a group. Tom Roe would go into the hotel to secure the rooms whenever the group moved to a new hotel or motel. Plaintiff and the other women would be left outside in the car with Tom Roe's armed associate or associates while Tom Roe procured the accommodations.

41.     Tom Roe would procure multiple hotel rooms and pay for them—as many as six or seven at any one time. The rooms were almost always in the back. Once procured, he

9

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

and his armed associate would walk Plaintiff and the other women through the doors, which were visible to the front desk staff, and assign each girl a room. Tom Roe never got a room for himself.

42.    Men would parade in and out through the front door of the hotel and head towards the rooms in the back all day long—as many as 12 in a single day—all in view of the front office of the hotel, and certainly all in view of the hotel's cameras. Tom Roe (or his designated associates) would either collect the cash—typically right after the johns left—in the hallway or outside the front doors of the hotel, or, if a motel, right outside the room doors.

43.    Tom Roe and his associates typically had one person standing guard in the hallway who was designated to take the cash. The others would wait outside—sometimes in the car and sometimes standing outside—but always in plain view, armed, and clearly there monitoring the area. Plaintiff would see them whenever she entered the hall or stepped outside to smoke a cigarette.

44.    Therefore, the Hotel Defendants had direct knowledge of sex trafficking at their respective hotels through their franchise owners and employees.

45.    Tom Roe employed fraud and the threat of violence to force Plaintiff into performing commercial sex acts.

46.    Tom Roe also used fraud. Roe told Plaintiff that she would be paid money for engaging in the commercial sex acts, but he kept the money to fund his own lifestyle, including purchasing clothes, shoes, and jewelry for himself.

47.    Tom Roe maintained control over the money at all times. Plaintiff was at Tom Roe's mercy when it came to buying personal items, including food, cigarettes, or personal hygiene products. Tom Roe would give Plaintiff only $10 at a time to purchase food or cigarettes—barely enough money to actually purchase any items—telling Plaintiff to "turn a trick" if she wanted more money.

48.    The only thing Tom Roe would provide in sufficient quantities was the narcotic drugs on which he hooked Plaintiff.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

49.     At all times, Plaintiff was afraid to leave, until she finally worked up the courage. Tom Roe's associates even warned her that Tom Roe would hurt her if she left. Once, Tom Roe thought she had called the police, and in trying to get her phone, he broke her arm (something every hotel would have noticed as she walked in and out). Tom Roe did not allow her to get proper medical care for it.

50.     When Plaintiff tried to leave again in 2022, Tom Roe found her and hit her so hard that it knocked out several of Plaintiff's teeth and loosened others.

51.     Despite Plaintiff's efforts to escape her trafficker, including moving several counties away, Tom Roe has found her multiple times. Once, Plaintiff came home to find him in her apartment. Tom Roe tied Plaintiff up, beat her and severely injured her back, and threatened to kill her if she left.

**B.  THE HOTEL VENTURES' LIABILITY IS CLEAR**

### 1.  Common Allegations

52.     Due to restrictions on how long anyone can stay at a hotel under California law before they are considered a resident, and likely due to other limitations, Tom Roe cleverly circulated among the same several hotels each month, bringing Plaintiff and other victims of sex trafficking with him.

53.     Each Defendant hotel owner/operator or its employees would have quickly become intimately familiar with Tom Roe and his activities with Plaintiff and other women during the time frame they were involved.

54.     Indeed, it readily appears that many of these hotels derive a significant portion of their money from the sex trade. They could scarcely continue to exist without it. And each relies on the other hotels to sustain their business model—as long as sex traffickers have some other hotel to stay at for a while, every hotel can be confident that the sex trafficking groups will be back later that month or the month after.

55.     As longer stays at any one hotel risk violating state laws about length of stay and inviting greater scrutiny from local law enforcement, a series of sex trafficking groups

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

like Tom Roe's allow hotel owners to confidently earn recurring revenue while avoiding detection, dressing willful ignorance up as plausible deniability.

56.     Upon information and belief, each Defendant hotel owner/operator utilized interactive computer service for things like managing room allocations, billing, booking, banking, and accounting, among other things.

57.     Thus, the hotels and hotel owners are part of a single informal conspiracy or, alternatively, a joint enterprise.

**2.   Motel 6 El Monte**

58.     Upon information and belief, during the times Plaintiff was trafficked, the Motel 6 El Monte was owned, controlled, and operated by El Monte Hospitality LLC and was franchised by Defendant G6 Hospitality LLC, Defendant, Motel 6 Operating L.P., Defendant, G.6 Hospitality Properties LLC, or one of their affiliates.

59.     Defendant El Monte Hospitality LLC, along with Defendants, G6 Hospitality LLC, G6 Hospitality Properties LLC, and Motel 6 Operating L.P., the Motel 6 El Monte, and the unnamed and unidentified employees thereof ("El Monte Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

60.     At all relevant times, the above Motel 6 El Monte Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

61.     At all relevant times, the Motel 6 El Monte Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time over the course of multiple days to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were likely being coerced into participating and thus were the victims of sex trafficking.

62.     The motel is laid out such that one must check in with the front desk to rent any of the rooms, and the room doors are in full view of hotel employees, as is the parking

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

right outside those doors, giving the hotel and its employees plain view and direct knowledge of the trafficking circumstances.

63.     Plaintiff was first trafficked at Motel 6 El Monte in late 2002 as a child, until as late as 2009. Plaintiff had been trafficked by a prominent member of the community—who frequently wore his official uniform—through the hotel, and Plaintiff was a minor at the time until the prominent member of the community gave her to Tom Roe a few years after first being trafficked at Motel 6 El Monte. The trafficking continued with Tom Roe when Plaintiff reached the age of majority and a few years after through 2009.

64.      In 2004, still a minor, Plaintiff was essentially kidnapped from her home by the prominent community member, taken to Motel 6 El Monte, and told to go with Tom Roe, a known sex trafficker, criminal, and member of organized crime, who continued to traffic Plaintiff at the Motel 6 El Monte.

65.     She never saw her initial trafficker again.

66.     When Tom Roe told Plaintiff to come with him, he also told her "you don't have a choice." He told her that she did not have the protection of her relatives anymore.

67.     Plaintiff walked out the front door as a minor with Tom Roe who was not the one who initially brought her to the hotel, and who had been known to the hotel staff as a sex trafficker. And no one at the hotel did anything to stop this. Now she is trying to put her life together.

68.     Over the next several years, Plaintiff was trafficking through the El Monte Motel 6 as a child and then as an adult, more often than not with a group of others, wherein multiple rooms were rented by her traffickers for the sole purpose of commercial sex acts.

69.     It was obvious to Plaintiff at the time that the hotel was mostly used for sex trafficking.

70.     The frequency of the stays and Tom Roe's modus operandi made the Hotel and its staff familiar with Plaintiff's traffickers and subjectively aware the trafficking.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

71. There was no way for the front desk personnel not to have noticed that Plaintiff was likely a trafficking victim. In addition to being a minor, Plaintiff exhibited other obvious signs of being trafficked because:

    a. On at least a dozen occasions, multiple rooms were booked as a block, typically by Tom Roe and in his name, and paid for by Tom Roe;

    b. Tom Roe or his accomplices and associates would stand guard outside the rooms and the hotel, in the breezeway halls which were visible to the outside and to the employees, were obviously armed, and frequently disciplined the sex trafficking victims, including Plaintiff, in the hallways and prevented them from leaving;

    c. Tom Roe or his accomplices collected the cash from their victims in the hotel's outdoor hallways or just outside the front door;

    d. Plaintiff was clearly drugged, frequently emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with the hotel staff;

    e. Plaintiff was always dressed provocatively and did not travel with much in the way of physical possessions;

    f. On each occasion, each day seven to ten unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day at all hours of the day, either after walking by the office or driving into the parking lot, always in full view of the hotel's employees and cameras;

    g. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

    h. Plaintiff was traveling with a group of women, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, and often exhibited bruises and other signs of physical violence or domination; and

14

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

i. Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they eventually entered the rooms.

72. The Motel 6 El Monte was franchised by Defendants, G6 Hospitality LLC or Motel 6 Operating L.P. or G6 Hospitality Property LLC, or their affiliates (hereinafter "G6 Franchisors), during the time of the Plaintiff was trafficked at the location.

73. As part of the franchisor/franchisee contractual relationship, upon information and belief, the G6 franchisors did and still do have the right to and do exercise substantial control over El Monte Hospitality LLC as their franchisee and were and are responsible for and have the contractual right to, among other things:

a. Create and define the safety standards that franchisees (i.e., El Monte Hospitality LLC) are supposed to maintain;

b. Clearly communicate those standards to franchisees (i.e., El Monte Hospitality LLC);

c. Create the materials for training franchisees (i.e., El Monte Hospitality LLC) and their employees;

d. Provide some or all of the training to franchisees (i.e., El Monte Hospitality LLC) or their employees;

e. Enforce the standards that franchisees (i.e., El Monte Hospitality LLC) are supposed to maintain;

f. Hold the franchisees (i.e., El Monte Hospitality LLC) to the standards that franchisees are supposed to maintain; and

g. Terminate and replace non-compliance franchisees (i.e., El Monte Hospitality LLC).

15

FIRST AMENDED COMPLAINT FOR DAMAGES     Case No. 5:24-cv-2350-AH-DTB

74.    Because of this relationship, the G6 Franchisors have the right to control and in fact do control whether El Monte Hospitality LLC or their other franchisees take reasonable actions to prevent sex trafficking.

75.    The G6 Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., El Monte Hospitality LLC) locations because of royalties, rents, and other monies subject to the G6 Franchisors' contractual relationship with Defendant El Monte Hospitality LLC, or other franchisees.

76.    The G6 Franchisors provide materials to train their franchisees, including El Monte Hospitality LLC, about the warning signs for sex trafficking within the hotels, and upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of El Monte Hospitality LLC, and other franchisees.

77.    The G6 Franchisors, upon information and belief, allowed their venture with Tom Roe and continued participating in the venture to continue profiting from the exploitation of the Plaintiff and other women by Tom Roe at the G6 Franchisors' franchisee locations, including El Monte Hospitality, LLC.

78.    The failure of the G6 Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including El Monte Hospitality LLC, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

79.    Upon information and belief, the G6 Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the G6 Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including El Monte Hospitality LLC, and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

80.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the

16

G6 Franchisors did nothing for eons. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable, and discovered that the hotels were part of an illicit trafficking venture.

81. The G6 Franchisors are part of the "ventures" involving several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at the El Monte Hospitality LLC location, but also providing the training and supervision to their franchisees, including El Monte Hospitality LLC, thereby providing actual and constructive knowledge for the activities including Tom Roe's sex trafficking of Plaintiff at El Monte Hospitality LLC, or the other franchisee locations.

82. The G6 Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including El Monte Hospitality LLC, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

83. The G6 Franchisors are or were based in Texas, which has for several decades sounded the bell on sex trafficking. The Texas Attorney General's Office has long published "Red Flags" for noticing sex trafficking:

- ❖ Person seems overly fearful, submissive, tense, or paranoid.
- ❖ Person is deferring to another person before giving information.
- ❖ Person has physical injuries or branding such as name tattoos on face or chest, tattoos about money and sex, or pimp phrases.
- ❖ Clothing is inappropriately sexual or inappropriate for weather.
- ❖ Minor is unaccompanied at night or falters in giving an explanation of who they are with and what they are doing.
- ❖ Identification documents are held by another.
- ❖ Person works long or excessive hours or is always available "on demand."
- ❖ Overly sexual for age or situation.

17

❖ Person does not appear free to come and go.

84.    The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

85.    The California Attorney General's Office likewise has published ways to identify sex trafficking, including:

❖ Is not free to leave or come and go as he/she wishes.

❖ Is in the commercial sex industry and has a pimp/manager.

❖ Is unpaid.

18

❖ Works excessively long and/or unusual hours.

❖ Is not allowed breaks or suffers under unusual restrictions at work.

❖ Faces high security measures.

❖ [Appears] fearful, anxious, depressed, submissive, tense, or nervous/paranoid.

❖ Exhibits unusually fearful or anxious behavior after bringing up law enforcement.

❖ Avoids eye contact.

❖ Appears malnourished or shows signs of repeated exposure to harmful chemicals.

❖ Shows signs of physical and/or sexual abuse, physical restraint, confinement.

❖ Has few or no personal possessions.

❖ Is not in control of his/her own money, no financial records, or bank account.

❖ Is not allowed or able to speak for themselves (a third party may insist on being present and/or translating).

❖ Has numerous inconsistencies in his/her story.[2]

86.    These commonsense features should have been obvious to the hotel owner defendants, including El Monte Hospitality LLC and the G6 Franchisors, even without them having been published by government authorities, at all times.

87.    The G6 Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[3]

88.    The G6 Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

89.    The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for

---

[2] https://oag.ca.gov/human-trafficking/identify.
[3] See, e.g., https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/; see, e.g., https://www.yelp.com/biz/motel-6-houston-north-spring-spring?rr=1.

19

FIRST AMENDED COMPLAINT FOR DAMAGES              Case No. 5:24-cv-2350-AH-DTB

Trafficking." This was highlighted by the G6 Franchisors several years ago whereby they claimed to have adopted specific standards.[4]

90.    The G6 Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the G6 Franchisors will start doing to combat it more effectively.

91.    The G6 Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[5]

92.    However, it still does not appear that much of what the G6 Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including El Monte Hospitality LLC's location, through 2022 as the G6 Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

93.    The G6 Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the G6 Franchisors could continue to profit.

94.    The G6 Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the G6 Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including El Monte Hospitality LLC, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the G6 Franchisors' franchised premises.

95.    As such, it was incumbent on the G6 Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including El Monte Hospitality LLC, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

---

[4] G6 Hospitality: https://g6hospitality.com/motel-6-expands-human-trafficking-awareness-and-prevention-efforts-through-partnerships-with-truckers-against-trafficking-and-new-friends-new-life/.

[5] G6 Hospitality: https://g6hospitality.com/about-us/combating-human-trafficking:/.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

96.    By all appearances, the hotels at issue, including El Monte Hospitality LLC, in this case would not survive financially without the sex trafficking business writ large.  The G6 Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the G6 Franchisors.

97.    Upon information and belief, the G6 Franchisors sent inspectors annually to grade each hotel, including El Monte Hospitality LLC. Those in-person inspections would have alerted the G6 Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that their licensees, including El Monte Hospitality LLC, were assisting and participating in a sex trafficking. These inspectors, who acted as agents of the G6 Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including El Monte Hospitality LLC, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the G6 Franchisors acquiesced to their continued participation in a venture with Tom Roe.

98.    The G6 Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the G6 Franchisors' hotels, including El Monte Hospitality LLC's location, to which their names are associated.

99.    Furthermore, Defendant, El Monte Hospitality LLC's hotel ventures and each of the G6 Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including El Monte Hospitality LLC, about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the G6 Franchisors' franchisees, including El Monte Hospitality LLC, among other similar things.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

### 3. Studio 6 Anaheim Hills

100. Plaintiff was trafficked through Studio 6 Anaheim Hills between about 2021 and 2022. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for several days each month.

101. Defendant 5710 La Palma L.P. and Defendant Anaheim Investment Inc., along with Defendants G6 Hospitality LLC, G6 Hospitality Property LLC, or Motel 6 Operating L.P. (hereinafter "G6 Franchisors") as franchisors, the Studio 6 Anaheim Hills hotel, and the unnamed and unidentified employees thereof ("Studio 6 Anaheim Hills Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

102. Upon information and belief, in or around March of 2021, Defendant 5710 La Palma L.P. sold the premises and Studio 6 Anaheim Hills business to Defendant Anaheim Investment Inc., where the business venture with Tom Roe's sex trafficking scheme continued.

103. At all relevant times, the above Studio 6 Anaheim Hills Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

104. At all relevant times, the Studio 6 Anaheim Hills Defendants had a continuous and repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

105. It was obvious to Plaintiff looking around that the hotel was frequented by women in the sex trade business, which was so ubiquitous that it appeared to be the hotel's key revenue driver.

106. At all relevant times, there were and still are cameras throughout the hotel's public areas, including its hallways.

FIRST AMENDED COMPLAINT FOR DAMAGES                    Case No. 5:24-cv-2350-AH-DTB

107.    There was no way for the front desk personnel not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

    a.  On more than a dozen occasions, multiple rooms were booked as a block typically under Tom Roe's name, always booked by Tom Roe alone, and paid for by Tom Roe;

    b.  Tom Roe had regular associates who would always stand guard outside the rooms and the hotel, were obviously armed, and frequently disciplined the sex trafficking victims, including Plaintiff, in the hallways and prevented them from leaving;

    c.  Tom Roe or his accomplice would collect the cash—typically right after the johns left—in the hotel's hallways or outside the front door;

    d.  Plaintiff was frequently emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

    e.  Plaintiff was dressed provocatively and rarely came and went with much in the way of personal possessions;

    f.  On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day at all times ,including late nights, either after walking by the front desk or through the back door when the hotel left it unlocked, but always in full view of the hotel's cameras;

    g.  Plaintiff was typically drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

    h.  Plaintiff was travelling with a group of women, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, and exhibited bruises and other signs of physical violence; and

23

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

i.    Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they eventually entered the room.

108.    Once, Plaintiff was outside the hotel during the Cinco de Mayo celebration. When she returned to her room, a strange man who Tom Roe or his associates had let in violently attacked her. Plaintiff escaped and ran to the hotel's front office, but none of the hotel's staff would help her.  She managed to call the police, for which Tom Roe "beat [her] a--."  Plaintiff later learned that Tom Roe had arranged with the hotel's staff for one of his clients with a rape fetish to be allowed into Plaintiff's room unbeknownst to her. It became obvious to Plaintiff that the hotel's staff purposefully left the back door unlocked to facilitate this sick and vile attack on Plaintiff.

109.    After finding out that Blackstone owned the hotel, she called them, and they offered her a free night's stay as compensation.

110.    In or around 2021, Plaintiff tried to escape with her daughter and stayed a night at that hotel. Hotel staff stole her and her daughter's clothes, as well as other items that Plaintiff had brought with her. When Plaintiff complained, the hotel offered to reimburse her $2,000.  When she came by to pick it up, it turned out that the hotel staff had alerted Tom Roe of Plaintiff's whereabouts, and he eventually caught up with her and assaulted her, thanks to the help of the Hotel's employees.

111.    It was and apparently still is common for prostitutes to hang outside and solicit male guests or visitors. This was reported in 2018 in a post titled "Cheap Hotel Complete with Prostitutes and Stabbings"—and G6 responded to it so they can't say they didn't know about it![6] There are also reports that homeless people take over at night throughout the entire

_____

[6] Cheap hotel complete with prostitutes and stabbings - Review of Studio 6 Anaheim, Anaheim, CA - Tripadvisor.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

hotel property.[7]

112.    The Studio 6 Anaheim Hills was franchised by Defendants G6 Hospitality LLC or Motel 6 Operating L.P. or G6 Hospitality Property LLC, or their affiliates (hereinafter "G6 Franchisors), during the time Plaintiff was trafficked at the location.

113.    As part of the franchisor/franchisee contractual relationship, the G6 franchisors did and still do exercise substantial control over Defendant 5710 La Palma L.P. or Defendant Anaheim Investment Inc., depending on the applicable time frame, as their franchisee and were and are responsible for and have the contractual right to, among other things:

    a.  Create and define the safety standards that franchisees (i.e., 5710 La Palma L.P. or Anaheim Investment Inc.) are supposed to maintain;

    b.  Clearly communicate those standards to franchisees (i.e., 5710 La Palma L.P. or Anaheim Investment Inc.);

    c.  Create the materials for training franchisees (i.e., 5710 La Palma L.P. or Anaheim Investment Inc.) and their employees;

    d.  Provide some or all of the training to franchisees (i.e., 5710 La Palma L.P. or Anaheim Investment Inc.) or their employees;

    e.  Enforce the standards that franchisees (i.e., 5710 La Palma L.P. or Anaheim Investment Inc.) are supposed to maintain;

    f.  Hold the franchisees (i.e., 5710 La Palma L.P. or Anaheim Investment Inc.) to the standards that franchisees are supposed to maintain; and

    g.  Terminate and replace non-compliance franchisees (i.e., 5710 La Palma L.P. or Anaheim Investment Inc.).

114.    Because of this relationship, the G6 Franchisors have the right to control and in fact do control whether 5710 La Palma L.P. and Anaheim Investment Inc. or their other franchisees take reasonable actions to prevent sex trafficking.

---

[7] STUDIO 6 ANAHEIM - Prices & Motel Reviews (CA).

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

115.    The G6 Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisees (i.e., 5710 La Palma L.P. and Anaheim Investment Inc.) locations because of royalties, rents, increased goodwill value, and other monies subject to the G6 Franchisors' contractual relationship with Defendants 5710 La Palma L.P. and Anaheim Investment Inc., or other franchisees.

116.    The G6 Franchisors provide materials to train their franchisees, including 5710 La Palma L.P. and Anaheim Investment Inc., about the warning signs for sex trafficking within the hotels and, upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of 5710 La Palma L.P. and Anaheim Investment Inc., and other franchisees.

117.    The G6 Franchisors, upon information and belief, had a (at a minimum, tacit) agreement with Tom Roe to allow their venture with Tom Roe and to continue participating in the venture to continue profiting from the exploitation of the Plaintiff and other women by Tom Roe at the G6 Franchisors' franchisee locations, including 5710 La Palma L.P. and Anaheim Investment Inc.

118.    The failure of the G6 Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including 5710 La Palma L.P. and Anaheim Investment Inc., on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

119.    Upon information and belief, the G6 Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the G6 Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including 5710 La Palma L.P. and Anaheim Investment Inc., and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

120.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the

G6 Franchisors did nothing for eons. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable,  and discovered that the hotels were part of an illicit trafficking venture.

121.    The G6 Franchisors are part of the "ventures" involving several hotels— owning and operating some during the relevant period that Plaintiff was trafficked at the 5710 La Palma L.P. and Anaheim Investment Inc. location, but also providing the training and supervision to their franchisees, including 5710 La Palma L.P. or Anaheim Investment Inc., thereby providing actual and constructive knowledge for the activities including Tom Roe's sex trafficking of Plaintiff at 5710 La Palma L.P. or Anaheim Investment Inc., or the other franchisee locations.

122.    The G6 Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including 5710 La Palma L.P. or Anaheim Investment Inc., while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

123.    The G6 Franchisors are or were based in Texas, which has for several decades sounded the bell on sex trafficking. The Texas Attorney General's Office has long published "Red Flags" for noticing sex trafficking:

- ❖ Person seems overly fearful, submissive, tense, or paranoid.
- ❖ Person is deferring to another person before giving information.
- ❖ Person has physical injuries or branding such as name tattoos on face or chest, tattoos about money and sex, or pimp phrases.
- ❖ Clothing is inappropriately sexual or inappropriate for weather.
- ❖ Minor is unaccompanied at night or falters in giving an explanation of who they are with and what they are doing.
- ❖ Identification documents are held by another.
- ❖ Person works long or excessive hours or is always available "on demand."

27

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

&#10023; Overly sexual for age or situation.

&#10023; Person is not free to come and go.

124.    The California Attorney General's Office likewise has published ways to identify sex trafficking, including:

&#10023; Is not free to leave or come and go as he/she wishes.

&#10023; Is in the commercial sex industry and has a pimp/manager.

&#10023; Is unpaid.

&#10023; Works excessively long and/or unusual hours.

&#10023; Is not allowed breaks or suffers under unusual restrictions at work.

&#10023; Faces high security measures.

&#10023; [Appears] fearful, anxious, depressed, submissive, tense, or nervous/paranoid.

&#10023; Exhibits unusually fearful or anxious behavior after bringing up law enforcement.

&#10023; Avoids eye contact.

&#10023; Appears malnourished or shows signs of repeated exposure to harmful chemicals.

&#10023; Shows signs of physical and/or sexual abuse, physical restraint, confinement.

&#10023; Has few or no personal possessions.

&#10023; Is not in control of his/her own money, no financial records, or bank account.

&#10023; Is not allowed or able to speak for themselves (a third party may insist on being present and/or translating).

&#10023; Has numerous inconsistencies in his/her story.[8]

125.    The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

&#10023; Does the person appear disconnected from family, friends, community organizations, or houses of worship?

---

[8] https://oag.ca.gov/human-trafficking/identify.

28

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

- ❖ Has a child stopped attending school?
- ❖ Has the person had a sudden or dramatic change in behavior?
- ❖ Is a juvenile engaged in commercial sex acts?
- ❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?
- ❖ Does the person have bruises in various stages of healing?
- ❖ Is the person fearful, timid, or submissive?
- ❖ Does the person show signs of having been denied food, water, sleep, or medical care?
- ❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?
- ❖ Does the person appear to be coached on what to say?
- ❖ Is the person living in unsuitable conditions?
- ❖ Does the person lack personal possessions and appear not to have a stable living situation?
- ❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

126. These commonsense inquiries should have been obvious to the hotel owner defendants, including 5710 La Palma L.P. and Anaheim Investment Inc., but also to the G6 Franchisors at all times without them having to have been posted or published.

127. The G6 Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[9]

128. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for

---

[9] See, e.g., https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/; see, e.g., https://www.yelp.com/biz/motel-6-houston-north-spring-spring?rr=1.

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

Trafficking." This was highlighted by the G6 Franchisors several years ago whereby they adopted more robust standards.[10]

129. The G6 Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the G6 Franchisors will start doing to combat it more effectively.

130. The G6 Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[11]

131. However, it still does not appear that much of what the G6 Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including 5710 La Palma L.P.'s and Anaheim Investment Inc.'s location, through 2022 as the G6 Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

132. The G6 Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the G6 Franchisors could continue to profit.

133. The G6 Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the G6 Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including 5710 La Palma L.P. and Anaheim Investment Inc., have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the G6 Franchisors' franchised premises.

134. The G6 Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

---

[10] G6 Hospitality: https://g6hospitality.com/motel-6-expands-human-trafficking-awareness-and-prevention-efforts-through-partnerships-with-truckers-against-trafficking-and-new-friends-new-life/.

[11] G6 Hospitality: https://g6hospitality.com/about-us/combating-human-trafficking;/.

30

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

135.    As such, it was incumbent on the G6 Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including 5710 La Palma L.P. and Anaheim Investment Inc., from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

136.    By all appearances, the hotels at issue, including 5710 La Palma L.P. and Anaheim Investment Inc., in this case would not survive financially without the sex trafficking business writ large.  The G6 Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the G6 Franchisors.

137.    Upon information and belief, the G6 Franchisors sent inspectors annually to grade each hotel, including 5710 La Palma L.P. and Anaheim Investment Inc. Those in-person inspections would have alerted the G6 Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including 5710 La Palma L.P. and Anaheim Investment Inc., were profiting from the sex trade businesses, which would have raised the likelihood of sex trafficking had they merely looked. These inspectors, who acted as agents of the G6 Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including 5710 La Palma L.P. and Anaheim Investment Inc., but since nothing changed in the sex trafficking and exploitation of Plaintiff, the G6 Franchisors acquiesced to their continued participation in a venture with Tom Roe.

138.    The G6 Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the G6 Franchisors' hotels to which their names are associated.

139.    Furthermore, Defendants', 5710 La Palma L.P. and Anaheim Investment Inc., hotel ventures and each of the G6 Franchisors used interstate interactive computer services

31

to book rooms, communicate with franchisees, including 5710 La Palma L.P. and Anaheim Investment Inc., about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the G6 Franchisors' franchisees, including 5710 La Palma L.P. and Anaheim Investment Inc., among other similar things.

### 4. Motel 6 San Bernardino City

140.    Plaintiff was trafficked through Motel 6 San Bernardino between about 2016 and 2022. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for several days each month (sometimes only two or three days; other times as many as seven days).

141.    Between  2012 and 2022, Defendant G6 Hospitality Property LLC and SB Hotel North LLC, were the owners and operators of the Motel 6 San Bernardino hotel the "Motel 6 San Bernadino City").

142.    During such time, Motel 6 Operating, L.P. and G6 Hospitality LLC were the franchisors (hereinafter "G6 Franchisors"), of the Motel 6 San Bernardino hotel. The operators, G6 Franchisors, and the unnamed and unidentified employees thereof ("Motel 6 San Bernardino Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

143.    At all relevant times, the above four Motel 6 San Bernardino Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

144.    At all relevant times, the Motel 6 San Bernardino Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

145.   At all relevant times, there were and are cameras throughout the hotel's public areas, including its hallways.

146.   There was no way for the front desk personnel not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

a.   On more than a dozen occasions, multiple rooms were booked as a block typically under Tom Roe's name, always booked by Tom Roe alone, and paid for by Tom Roe;

b.   Tom Roe had regular associates who would always stand guard outside the rooms and the hotel, were obviously armed, and frequently disciplined the sex trafficking victims, including Plaintiff, in the hallways and prevented them from leaving;

c.   Tom Roe or his accomplice would collect cash in the hotel's hallways or outside the front door;

d.   Plaintiff was frequently emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

e.   Plaintiff was dressed provocatively and rarely came and went with much in the way of personal possessions;

f.   On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day at all times, including late nights, either after walking by the front desk or through the back door when the hotel left it unlocked, but always in full view of the hotel's cameras;

g.   Plaintiff was typically drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking— and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

h.   Plaintiff was travelling with a group of women, many of whom, like her, were

33

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

emaciated, showed signs of heavy drug usage, were dressed provocatively, and exhibited bruises and other signs of physical violence; and

i. Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they eventually entered the room.

147. At least two employees who worked at Motel 6 San Bernadino were recruited by Tom Roe to help control the women he was trafficking. These employees would monitor and inform on Plaintiff and the other women's movements to ensure that Tom Roe maintained control over them.

148. Once, when Tom Roe or his associates were trafficking Plaintiff in a room close to the hotel's office, she was assaulted by one of the male visitors. The clamor should have alerted the hotel's office and front desk staff to call the police, but they did not. Instead, Plaintiff called the police, which angered Tom Roe, and he physically assaulted Plaintiff in full view of the hotel's employees. However, when the police came, the tapes from the hotel cameras had been redacted and edited by the hotel's employees to cut out the inculpatory clips. Tom Roe told Plaintiff that they had done this at his behest. Plaintiff, incensed, secretly called Motel 6 headquarters and spoke to a "Sherie" who acknowledged the incident but, instead of launching an investigation, gave Plaintiff the runaround and refused to assist in any way. Tom Roe punished Plaintiff for this "outburst".

149. The hotel has been reviewed online noting that there are homeless people outside and reports of an undercover police bust of a sex ring.[12]

---

[12] San Bernardino Media News | 01/25/24- At 7:45pm San Bernardino county sheriffs department were at the Motel 6 on F St and 5th Street. Not a lot of details were given,... | Instagram.

FIRST AMENDED COMPLAINT FOR DAMAGES             Case No. 5:24-cv-2350-AH-DTB

150. The Motel 6 San Bernadino City was franchised by Defendants G6 Hospitality LLC or Motel 6 Operating L.P. or G6 Hospitality Property LLC, or their affiliates (hereinafter "G6 Franchisors) during the time Plaintiff was trafficked at the location.

151. As part of the franchisor/franchisee contractual relationship, the G6 Franchisors did and still do exercise substantial control over the Motel 6 San Bernadino City as their franchisee and were and are responsible for and have the contractual right to, among other things:

    a. Create and define the safety standards that franchisees (i.e., the Motel 6 San Bernadino City) are supposed to maintain;

    b. Clearly communicate those standards to franchisees (i.e., the Motel 6 San Bernadino City);

    c. Create the materials for training franchisees (i.e., the Motel 6 San Bernadino City) and their employees;

    d. Provide some or all of the training to franchisees (i.e., the Motel 6 San Bernadino City) or their employees;

    e. Enforce the standards that franchisees (i.e., the Motel 6 San Bernadino City) are supposed to maintain;

    f. Hold the franchisees (i.e., the Motel 6 San Bernadino City) to the standards that franchisees are supposed to maintain; and

    g. Terminate and replace non-compliance franchisees (i.e., the Motel 6 San Bernadino City).

152. Because of this relationship, the G6 Franchisors have the right to control and in fact do control whether the Motel 6 San Bernadino City or their other franchisees take reasonable actions to prevent sex trafficking.

153. The G6 Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., the Motel 6 San Bernadino City) locations because of royalties, rents, and other monies subject to the G6 Franchisors' contractual relationship with the Motel 6 San Bernadino City or other franchisees.

FIRST AMENDED COMPLAINT FOR DAMAGES     Case No. 5:24-cv-2350-AH-DTB

154.    The G6 Franchisors provide materials to train their franchisees, including the Motel 6 San Bernadino City, about the warning signs for sex trafficking within the hotels and, upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of the Motel 6 San Bernadino City, and other franchisees.

155.    The G6 Franchisors, upon information and belief, tacitly continued participating in the venture profiting from the exploitation of the Plaintiff and other women by Tom Roe at the G6 Franchisors' franchisee locations, including the Motel 6 San Bernadino City.

156.    The failure of the G6 Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including the Motel 6 San Bernadino City, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

157.    Upon information and belief, the G6 Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the G6 Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including the Motel 6 San Bernadino City, and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

158.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the G6 Franchisors did nothing for eons. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable, and discovered that the hotels were part of an illicit trafficking venture.

159.    The G6 Franchisors are part of the "ventures" involving several hotels— owning and operating some during the relevant period that Plaintiff was trafficked at the

36

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

Motel 6 San Bernadino City location, but also providing the training and supervision to their franchisees, including the Motel 6 San Bernadino City, thereby providing actual and constructive knowledge for the activities including Tom Roe's sex trafficking of Plaintiff at the Motel 6 San Bernadino City, or the other franchisee locations.

160.    The G6 Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including the Motel 6 San Bernadino City, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

161.    The G6 Franchisors are or were based in Texas, which has for several decades sounded the bell on sex trafficking. The Texas Attorney General's Office has long published "Red Flags" for noticing sex trafficking:

- ❖ Person seems overly fearful, submissive, tense, or paranoid.
- ❖ Person is deferring to another person before giving information.
- ❖ Person has physical injuries or branding such as name tattoos on face or chest, tattoos about money and sex, or pimp phrases.
- ❖ Clothing is inappropriately sexual or inappropriate for weather.
- ❖ Minor is unaccompanied at night or falters in giving an explanation of who they are with and what they are doing.
- ❖ Identification documents are held by another.
- ❖ Person works long or excessive hours or is always available "on demand."
- ❖ Overly sexual for age or situation.
- ❖ Person is not free to come and go.

162.    The California Attorney General's Office likewise has published ways to identify sex trafficking, including:

- ❖ Is not free to leave or come and go as he/she wishes.
- ❖ Is in the commercial sex industry and has a pimp/manager.
- ❖ Is unpaid.

37

❖ Works excessively long and/or unusual hours.

❖ Is not allowed breaks or suffers under unusual restrictions at work.

❖ Faces high security measures.

❖ [Appears] fearful, anxious, depressed, submissive, tense, or nervous/paranoid.

❖ Exhibits unusually fearful or anxious behavior after bringing up law enforcement.

❖ Avoids eye contact.

❖ Appears malnourished or shows signs of repeated exposure to harmful chemicals.

❖ Shows signs of physical and/or sexual abuse, physical restraint, confinement.

❖ Has few or no personal possessions.

❖ Is not in control of his/her own money, no financial records, or bank account.

❖ Is not allowed or able to speak for themselves (a third party may insist on being present and/or translating).

❖ Has numerous inconsistencies in his/her story.

163. The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

164. These commonsense inquiries should have been obvious to the hotel owner defendants, including the Motel 6 San Bernadino City, but also to the G6 Franchisors at all times.

165. The G6 Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[13]

166. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking." This was highlighted by the G6 Franchisors several years ago whereby they adopted more robust standards.[14]

167. The G6 Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the G6 Franchisors will start doing to combat it more effectively.

168. The G6 Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[15]

---

[13] See, e.g., https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/; see, e.g., https://www.yelp.com/biz/motel-6-houston-north-spring-spring?rr=1.

[14] G6 Hospitality: https://g6hospitality.com/motel-6-expands-human-trafficking-awareness-and-prevention-efforts-through-partnerships-with-truckers-against-trafficking-and-new-friends-new-life/.

[15] G6 Hospitality: https://g6hospitality.com/about-us/combating-human-trafficking;/.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

169.   However, it still does not appear that much of what the G6 Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including the Motel 6 San Bernadino City's location, through 2022 as the G6 Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

170.   The G6 Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the G6 Franchisors could continue to profit.

171.   The G6 Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the G6 Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including the Motel 6 San Bernadino City, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the G6 Franchisors' franchised premises.

172.   The G6 Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

173.   As such, it was incumbent on the G6 Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including the Motel 6 San Bernadino City, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

174.   By all appearances, the Motel 6 San Bernadino City in this case would not survive financially without the sex trafficking business writ large.  The G6 Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by the Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the G6 Franchisors.

175.   Upon information and belief, the G6 Franchisors sent inspectors annually to grade each hotel, including the Motel 6 San Bernadino City, and to ensure compliance with

40

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

Motel 6 standards. Those in-person inspections would have alerted the G6 Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including the Motel 6 San Bernadino City, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors, who acted as agents of the G6 Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including the Motel 6 San Bernadino City, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the G6 Franchisors acquiesced to their continued participation in a venture with Tom Roe.

176.    The G6 Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the G6 Franchisors' hotels, including the Motel 6 San Bernadino City's location, to which their names are associated.

177.    Furthermore, the Motel 6 San Bernadino City hotel ventures and each of the G6 Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including the Motel 6 San Bernadino City, about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the G6 Franchisors' franchisees, including the Motel 6 San Bernadino City, among other similar things.

5.  **Motel 6 Chino**

178.    Plaintiff was trafficked through Motel 6 Chino between about 2011 and 2022. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for five to six days each month.

179.    Between about 2012 and 2019, Defendant Motel 6 Operating L.P., along with G6 Hospitality LLC and G6 Hospitality Property LLC (hereinafter "G6 Franchisors") as franchisor, the Motel 6 Chino hotel, and the unnamed and unidentified employees thereof ("Motel 6 Chino Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

180.  Between about 2019 and 2021, Defendant, Motel 6 Operating L.P., along with G6 Hospitality LLC as franchisor, the Motel 6 Chino hotel, and the unnamed and unidentified employees thereof (Motel 6 Chino Roes) formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

181.  At all relevant times, the above Motel 6 Chino Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

182.  At all relevant times, the above-described Motel 6 Chino Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women or underage girls who were coerced into participating and thus were the victims of sex trafficking.

183.  At all relevant times, there were and are cameras throughout the hotel's common areas, including its hallways.

184.  The hotel is laid out such that one must pass the front office to check in and book rooms, and access to any of the rooms is generally outdoors, giving the hotel employees plain view and direct knowledge of the trafficking circumstances.

185.  There was no way for the front desk personnel not to have noticed that Plaintiff was likely a trafficking victim. In addition to being a minor, Plaintiff exhibited other obvious signs of being trafficked because:

    a.  On at least a dozen occasions, multiple rooms were booked as a block, typically by Tom Roe and in his name, and paid for by Tom Roe;

    b.  Tom Roe or his accomplices and associates would stand guard outside the rooms and the hotel, in the breezeway halls which were visible to the outside

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

and to the employees, were obviously armed, and frequently disciplined the sex trafficking victims, including Plaintiff, in the hallways and prevented them from leaving;

c. Tom Roe or his accomplices collected the cash from their victims in the hotel's outdoor hallways or just outside the front door;

d. Plaintiff was clearly drugged, frequently emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with the hotel staff;

e. Plaintiff was always dressed provocatively and did not travel with much in the way of physical possessions;

f. On each occasion, each day seven to ten unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day at all hours of the day, either after walking by the office or driving into the parking lot, always in full view of the hotel's employees and cameras;

g. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

h. Plaintiff was traveling with a group of women, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, and often exhibited bruises and other signs of physical violence or domination; and

i. Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they eventually entered the rooms.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

186.    To prove the point, an employee named "Marina" would help direct "Johns" to the rooms and would tell on any of the sex trafficking victims who tried to converse with her or with any hotel guests, because Tom Roe viewed that as the women trying to make money on the side and cut him out.

187.    In about 2021, Plaintiff tried to escape, but after being alerted by hotel staff, Tom Roe found her. The hotel staff witnessed them arguing and saw Tom Roe head butt her and break her nose as punishment.

188.    The local media has made a reference to the existence of criminal activity occurring right under the noses of the hotel employees.[16]

189.    The Motel 6 Chino was franchised by Defendants G6 Hospitality LLC or Motel 6 Operating L.P. or G6 Hospitality Property LLC, or their affiliates (hereinafter "G6 Franchisors), during the time Plaintiff was trafficked at the location.

190.    As part of the franchisor/franchisee contractual relationship, the G6 Franchisors did and still do exercise substantial control over the Motel 6 Chino as their franchisee and were and are responsible for and have the contractual right to, among other things:

    a.  Create and define the safety standards that franchisees (i.e., the Motel 6 Chino) are supposed to maintain;

    b.  Clearly communicate those standards to franchisees (i.e., the Motel 6 Chino);

    c.  Create the materials for training franchisees (i.e., the Motel 6 Chino) and their employees;

    d.  Provide some or all of the training to franchisees (i.e., the Motel 6 Chino) or their employees;

    e.  Enforce the standards that franchisees (i.e., the Motel 6 Chino) are supposed to maintain;

[16] https://www.championnewspapers.com/police_and_fire_notes/article_1b386256-51d3-11eb-b6ae-6bd789039137.html.

44

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

      f.   Hold the franchisees (i.e., the Motel 6 Chino) to the standards that franchisees are supposed to maintain; and

      g.   Terminate and replace non-compliance franchisees (i.e., the Motel 6 Chino).

191.    Because of this relationship, the G6 Franchisors have the right to control and in fact do control whether the Motel 6 Chino or their other franchisees take reasonable actions to prevent sex trafficking.

192.    The G6 Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., the Motel 6 Chino) locations because of royalties, rents, and other monies subject to the G6 Franchisors' contractual relationship with the Motel 6 Chino or other franchisees.

193.     The G6 Franchisors provide materials to train their franchisees, including the Motel 6 Chino, about the warning signs for sex trafficking within the hotels, and upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of the Motel 6 Chino, and other franchisees.

194.    The G6 Franchisors, upon information and belief, at least tacitly continued participating in the venture profiting from the exploitation of Plaintiff and other women by Tom Roe at the G6 Franchisors' franchisee locations, including the Motel 6 Chino.

195.    The obvious knowledge of the G6 Franchisors of the existence of sex trafficking and the intentional refusal to identify probable sex trafficking are due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including the Motel 6 Chino, on how to spot sex trafficking, and then knowingly and intentionally taking no action to ensure that those measures are deployed.

196.    Upon information and belief, the G6 Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the G6 Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including the Motel 6 Chino, and their employees questions as part of their reviews to identify whether they had

FIRST AMENDED COMPLAINT FOR DAMAGES      Case No. 5:24-cv-2350-AH-DTB

seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

197.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the G6 Franchisors did nothing for eons. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable, and discovered that the hotels were part of an illicit trafficking venture.

198.    The G6 Franchisors are part of the "ventures" involving several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at the Motel 6 Chino location, but also providing the training and supervision to their franchisees, including the Motel 6 Chino, thereby providing actual and constructive knowledge for the activities, including Tom Roe's sex trafficking of Plaintiff at the Motel 6 Chino, or the other franchisee locations.

199.    The G6 Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including the Motel 6 Chino, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

200.    The G6 Franchisors are or were based in Texas, which has for several decades sounded the bell on sex trafficking. The Texas Attorney General's Office has long published "Red Flags" for noticing sex trafficking:

- ❖ Person seems overly fearful, submissive, tense, or paranoid.
- ❖ Person is deferring to another person before giving information.
- ❖ Person has physical injuries or branding such as name tattoos on face or chest, tattoos about money and sex, or pimp phrases.
- ❖ Clothing is inappropriately sexual or inappropriate for weather.

46

- ❖ Minor is unaccompanied at night or falters in giving an explanation of who they are with and what they are doing.
- ❖ Identification documents are held by another.
- ❖ Person works long or excessive hours or is always available "on demand."
- ❖ Overly sexual for age or situation.
- ❖ Person is not free to come and go.

201. The California Attorney General's Office likewise has published ways to identify sex trafficking, including:

- ❖ Is not free to leave or come and go as he/she wishes.
- ❖ Is in the commercial sex industry and has a pimp / manager.
- ❖ Is unpaid.
- ❖ Works excessively long and/or unusual hours.
- ❖ Is not allowed breaks or suffers under unusual restrictions at work.
- ❖ Faces high security measures.
- ❖ [Appears] fearful, anxious, depressed, submissive, tense, or nervous/paranoid.
- ❖ Exhibits unusually fearful or anxious behavior after bringing up law enforcement.
- ❖ Avoids eye contact.
- ❖ Appears malnourished or shows signs of repeated exposure to harmful chemicals.
- ❖ Shows signs of physical and/or sexual abuse, physical restraint, confinement.
- ❖ Has few or no personal possessions.
- ❖ Is not in control of his/her own money, no financial records, or bank account.
- ❖ Is not allowed or able to speak for themselves (a third party may insist on being present and/or translating).
- ❖ Has numerous inconsistencies in his/her story.

202. The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

47

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

203.    These commonsense inquiries should have been obvious to the hotel owner defendants, including the Motel 6 Chino, but also to the G6 Franchisors at all times.

204.    The G6 Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[17]

---

[17] See, e.g., https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/; see, e.g., https://www.yelp.com/biz/motel-6-houston-north-spring-spring?rr=1.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

205. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking." This was highlighted by the G6 Franchisors several years ago whereby they adopted more robust standards.[18]

206. The G6 Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the G6 Franchisors will start doing to combat it more effectively.

207. The G6 Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[19]

208. However, it still does not appear that much of what the G6 Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including the Motel 6 Chino's location, through 2022 as the G6 Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

209. The G6 Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the G6 Franchisors could continue to profit.

210. The G6 Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the G6 Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including the Motel 6 Chino, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the G6 Franchisors' franchised premises.

211. The G6 Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

---

[18] G6 Hospitality: https://g6hospitality.com/motel-6-expands-human-trafficking-awareness-and-prevention-efforts-through-partnerships-with-truckers-against-trafficking-and-new-friends-new-life/.

[19] G6 Hospitality: https://g6hospitality.com/about-us/combating-human-trafficking;/.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

212.    As such, it was incumbent on the G6 Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including the Motel 6 Chino, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

213.    By all appearances, the hotels at issue, including the Motel 6 Chino, in this case would not survive financially without the sex trafficking business writ large.  The G6 Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the G6 Franchisors.

214.    Upon information and belief, the G6 Franchisors sent inspectors annually to grade each hotel, including the Motel 6 Chino. Those in-person inspections would have alerted the G6 Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including the Motel 6 Chino, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors, who acted as agents of the G6 Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including the Motel 6 Chino, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the G6 Franchisors acquiesced to their continued participation in a venture with Tom Roe.

215.    The G6 Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the G6 Franchisors' hotels, including the Motel 6 Chino's location, to which their names are associated.

216.    Furthermore, the Motel 6 Chino hotel venture and each of the G6 Franchisors used interstate interactive computer services to manage room occupancy, book rooms, report revenues and fees, and communicate with franchisees, including the Motel 6 San Bernadino City, about bookings, clear financial transactions for the rooms, communicate online

50

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the G6 Franchisors' franchisees, including the Motel 6 Chino, among other similar things.

**6. Motel 6 Pomona**

217.    Plaintiff was trafficked through Motel 6 Pomona from about 2012 through 2020. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for several days each month.

218.    At all relevant times, Defendant G6 Hospitality Property LLC as owner, along with G6 Hospitality LLC, as franchisor, the Motel 6 Pomona hotel, and the unnamed and unidentified employees thereof ("Motel 6 Pomona Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

219.    At all relevant times, the above Motel 6 Pomona Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

220.    At all relevant times, the above-described Motel 6 Pomona Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

221.    At all relevant times, there were and are cameras throughout the hotel's public areas, including its hallways.

222.    The hotel is laid out such that one must pass the front desk to access any of the rooms, giving the hotel employees plain view and direct knowledge of the trafficking circumstances.

FIRST AMENDED COMPLAINT FOR DAMAGES                Case No. 5:24-cv-2350-AH-DTB

223.    There was no way for the front desk personnel not to have noticed that Plaintiff was likely a trafficking victim. In addition to being a minor, Plaintiff exhibited other obvious signs of being trafficked because:

a.  On at least a dozen occasions, multiple rooms were booked as a block, typically by Tom Roe and in his name, and paid for by Tom Roe;

b.  Tom Roe or his accomplices and associates would stand guard outside the rooms and the hotel, in the breezeway halls which were visible to the outside and to the employees, were obviously armed, and frequently disciplined the sex trafficking victims, including Plaintiff, in the hallways and prevented them from leaving;

c.  Tom Roe or his accomplices collected the cash from their victims in the hotel's outdoor hallways or just outside the front door;

d.  Plaintiff was clearly drugged, frequently emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with the hotel staff;

e.  Plaintiff was always dressed provocatively and did not travel with much in the way of physical possessions;

f.  On each occasion, each day seven to ten unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day at all hours of the day, either after walking by the office or driving into the parking lot, always in full view of the hotel's employees and cameras;

g.  Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

h.  Plaintiff was traveling with a group of women, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, and often exhibited bruises and other signs of physical violence or domination; and

52

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they eventually entered the rooms.

    i.   The hotel staff were familiar with Tom Roe and Plaintiff and had no illusions about what was happening.

224. Over the nearly decade-long routine visits of Tom Roe, employees of the hotel knew that he was likely a sex trafficker, and they facilitated not only his repeated use of the hotel for his exploits but also ensured his ability to elude being caught and being held accountable.

225. The Motel 6 Pomona is so hospitable to sex trafficking that in a 2014 incident, a man brutally murdered a woman at the hotel, removed one of her lungs and heart—the former while the woman was still alive—and escaped before the police arrived. And yet, upon information and belief, the woman's screams and the loud fighting did not stir a single inquiry from the hotel's employees.[20]

226. The Motel 6 Pomona was franchised by Defendants G6 Hospitality LLC or Motel 6 Operating L.P. or G6 Hospitality Property LLC, or their affiliates (hereinafter "G6 Franchisors) during the time of the Plaintiff was trafficked at the location.

227. As part of the franchisor/franchisee contractual relationship, the G6 Franchisors did and still do exercise substantial control over the Motel 6 Pomona as their franchisee and were and are responsible for and have the contractual right to, among other things:

    a.   Create and define the safety standards that franchisees (i.e., the Motel 6 Pomona) are supposed to maintain;

---

[20] Man Who Removed Girlfriend's Lung While She Was Alive at Pomona Motel Sentenced to Life in Prison: DA | KTLA.

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

b. Clearly communicate those standards to franchisees (i.e., the Motel 6 Pomona);

c. Create the materials for training franchisees (i.e., the Motel 6 Pomona) and their employees;

d. Provide some or all of the training to franchisees (i.e., the Motel 6 Pomona) or their employees;

e. Enforce the standards that franchisees (i.e., the Motel 6 Pomona) are supposed to maintain;

f. Hold the franchisees (i.e., the Motel 6 Pomona) to the standards that franchisees are supposed to maintain; and

g. Terminate and replace non-compliance franchisees (i.e., the Motel 6 Pomona).

228.    Because of this relationship, the G6 Franchisors have the right to control and in fact do control whether the Motel 6 Pomona or their other franchisees take reasonable actions to prevent sex trafficking.

229.    The G6 Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., the Motel 6 Pomona) locations because of royalties, rents, and other monies subject to the G6 Franchisors' contractual relationship with the Motel 6 Pomona or other franchisees.

230.     The G6 Franchisors provide materials to train their franchisees, including the Motel 6 Pomona, about the warning signs for sex trafficking within the hotels and, upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of the Motel 6 Pomona, and other franchisees.

231.    The G6 Franchisors, upon information and belief, had a tacit agreement with Tom Roe to allow their venture with Tom Roe and to continue participating in the venture to continue profiting from the exploitation of Plaintiff and other women by Tom Roe at the G6 Franchisors' franchisee locations, including the Motel 6 Pomona.

232.    The failure of the G6 Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train

54

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

franchisees, including the Motel 6 Pomona, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

233. Upon information and belief, the G6 Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the G6 Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including the Motel 6 Pomona, and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

234. These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the G6 Franchisors did nothing for eons. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable, and discovered that the hotels were part of an illicit trafficking venture.

235. The G6 Franchisors are part of the "ventures" involving several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at the Motel 6 Pomona location, but also providing the training and supervision to their franchisees, including the Motel 6 Pomona, thereby providing actual and constructive knowledge for the activities including Tom Roe's sex trafficking of Plaintiff at the Motel 6 Pomona, or the other franchisee locations.

236. The G6 Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including the Motel 6 Pomona, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

237. The G6 Franchisors are or were based in Texas, which has for several decades sounded the bell on sex trafficking. The Texas Attorney General's Office has long published "Red Flags" for noticing sex trafficking:

❖ Person seems overly fearful, submissive, tense, or paranoid.

❖ Person is deferring to another person before giving information.

❖ Person has physical injuries or branding such as name tattoos on face or chest, tattoos about money and sex, or pimp phrases.

❖ Clothing is inappropriately sexual or inappropriate for weather.

❖ Minor is unaccompanied at night or falters in giving an explanation of who they are with and what they are doing.

❖ Identification documents are held by another.

❖ Person works long or excessive hours or is always available "on demand."

❖ Overly sexual for age or situation.

❖ Person is not free to come and go.

238. The California Attorney General's Office likewise has published ways to identify sex trafficking, including:

❖ Is not free to leave or come and go as he/she wishes.

❖ Is in the commercial sex industry and has a pimp/manager.

❖ Is unpaid.

❖ Works excessively long and/or unusual hours.

❖ Is not allowed breaks or suffers under unusual restrictions at work.

❖ Faces high security measures.

❖ [Appears] fearful, anxious, depressed, submissive, tense, or nervous/paranoid.

❖ Exhibits unusually fearful or anxious behavior after bringing up law enforcement.

❖ Avoids eye contact.

❖ Appears malnourished or shows signs of repeated exposure to harmful chemicals.

56

❖ Shows signs of physical and/or sexual abuse, physical restraint, confinement.

❖ Has few or no personal possessions.

❖ Is not in control of his/her own money, no financial records, or bank account.

❖ Is not allowed or able to speak for themselves (a third party may insist on being present and/or translating).

❖ Has numerous inconsistencies in his/her story

239.   The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

57

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

240. These commonsense inquiries should have been obvious to the hotel owner defendants, including the Motel 6 Pomona, but also to the G6 Franchisors at all times.

241. The G6 Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[21]

242. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking." This was highlighted by the G6 Franchisors several years ago whereby they adopted more robust standards.[22]

243. The G6 Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the G6 Franchisors will start doing to combat it more effectively.

244. The G6 Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[23]

245. However, it still does not appear that much of what the G6 Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including the Motel 6 Pomona's location, through 2022 as the G6 Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

246. The G6 Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the G6 Franchisors could continue to profit.

247. The G6 Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the G6 Franchisors' publicized stance and knowledge of

---

[21] See, e.g., https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/; see, e.g., https://www.yelp.com/biz/motel-6-houston-north-spring-spring?rr=1.

[22] G6 Hospitality: https://g6hospitality.com/motel-6-expands-human-trafficking-awareness-and-prevention-efforts-through-partnerships-with-truckers-against-trafficking-and-new-friends-new-life/.

[23] G6 Hospitality: https://g6hospitality.com/about-us/combating-human-trafficking;/.

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

sex trafficking at their franchised locations, including the Motel 6 Pomona, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the G6 Franchisors' franchised premises.

248.    The G6 Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

249.    As such, it was incumbent on the G6 Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including the Motel 6 Pomona, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

250.    By all appearances, the hotels at issue, including the Motel 6 Pomona, in this case would not survive financially without the sex trafficking business writ large.  The G6 Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorneys General as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the G6 Franchisors.

251.    Upon information and belief, the G6 Franchisors sent inspectors annually to grade each hotel, including the Motel 6 Pomona. Those in-person inspections would have alerted the G6 Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize— that the hotels, including the Motel 6 Pomona, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors, who acted as agents of the G6 Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including the Motel 6 Pomona, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the G6 Franchisors acquiesced to their continued participation in a venture with Tom Roe.

252.    The G6 Franchisors also should have been aware of the public postings and

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

reviews that described the rampant sex trade at the G6 Franchisors' hotels, including the Motel 6 Pomona's location, to which their names are associated.

253.    Furthermore, the Motel 6 Pomona hotel ventures and each of the G6 Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including the Motel 6 Pomona, about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the G6 Franchisors' franchisees, including the Motel 6 Pomona, among other similar things.

**7.  Econo Inn**

254.    Plaintiff was trafficked through Econo Inn as a minor between 2002 and 2006 and then as an adult between about 2006 and 2009. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for several days each month and occasionally for extended periods of time.

255.    At all relevant times, Defendants Prashant R Vaghashia and Mita P Vaghashia as owners, the Econo Inn hotel, and the unnamed and unidentified employees thereof ("Econo Inn Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

256.    At all relevant times, the above Econo Inn Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

257.    At all relevant times, the above described Econo Inn Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

258. The hotel is laid out such that one must check in with the front desk to access any of the rooms. The hotel has cameras and is otherwise laid out such that hotel employees have plain view and direct knowledge of the trafficking circumstances.

259. There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

a. On at least a dozen occasions, multiple rooms were booked as a block typically under Tom Roe's name, booked by Tom Roe alone, and paid for by Tom Roe;

b. Tom Roe or his accomplices and associates would stand guard outside the rooms in the hallway, were obviously armed, and frequently disciplined the sex trafficking victims and prevented them from leaving;

c. Tom Roe or his accomplices would collect the cash—typically right after the johns left—in the hotel's hallways or just outside the front door;

d. Plaintiff was emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

e. Plaintiff was dressed provocatively (even as a minor);

f. On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day and at all times at night, either after walking by the front desk or front office, but always in full view of the hotel's cameras;

g. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

h. Plaintiff was travelling with a group of women, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, and exhibited bruises and other signs of physical violence; and

61

FIRST AMENDED COMPLAINT FOR DAMAGES Case No. 5:24-cv-2350-AH-DTB

      i.   Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring in the room, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the room, such as used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia.

260. The hotel staff were familiar with Tom Roe and Plaintiff and had no illusions about what was happening

261. The front desk workers appeared to know Tom Roe very well whenever Plaintiff, Tom Roe, and others, would stay there together. This hotel appeared to be Tom Roe's "back-up" whenever he needed a place to stay. Plaintiff recalls being there "all the time" for the entire period at issue through 2009.

262. The hotel's public reviews confirm that there are robust sex trafficking and prostitution rings operating out of the hotel.[24]

## 8. West Coast Inn—Ontario

263. Plaintiff was trafficked as a minor between 2002 and 2006, and then as an adult between 2006 and 2020 through the West Coast Inn in Ontario off and on. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for two or three days. Upon information and belief, the Hotel was owned and operated by a father-and-son team; their names are presently unknown and unidentifiable.

264. At all relevant times, there were cameras throughout the public areas of the hotel, including its hallways.

265. The hotel is laid out such that one must pass the front desk to access any of the rooms, giving the hotel employees plain view and direct knowledge of the trafficking circumstances.

266. There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious

---

[24] https://www.tripadvisor.co.uk/Hotel_Review-g32823-d1224617-Reviews-Econo_Inn-Ontario_California.html (noting that a prostitute "flashed" a guest in public and solicited him).

FIRST AMENDED COMPLAINT FOR DAMAGES      Case No. 5:24-cv-2350-AH-DTB

signs of being trafficked because:

   a. On at least a dozen occasions, multiple rooms were booked as a block typically under Tom Roe's name, booked by Tom Roe alone, and paid for by Tom Roe;

   b. Tom Roe or his accomplices and associates would stand guard outside the rooms and the hotels, were obviously armed, and frequently disciplined the sex trafficking victims in the hallways and prevented them from leaving;

   c. Tom Roe would collect the cash just outside the front door of the room or in the parking lot which was in full view of the hotel's office;

   d. Plaintiff was a minor and emaciated, never left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

   e. Plaintiff was dressed provocatively and never would have appeared to have much in the way of personal possessions;

   f. On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day and at all times at night, after walking by the front desk, but always in full view of the hotel's staff and cameras;

   g. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

   h. Plaintiff was travelling with a group of women as few as three and as many as five at a time, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, had little to no possessions, and exhibited bruises and other signs of physical violence; and

   i. Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

as used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they entered the rooms.

j. The hotel staff were familiar with Tom Roe and Plaintiff and had no illusions about what was happening

267. Perhaps most damning is that Plaintiff was forced by Tom Roe to give oral sex to one of the men who ran the hotel and to have sexual intercourse with his father who also ran it on multiple occasions in exchange for free room rental and turning the other way.

268. The hotel was an obvious haven for sex trafficking as almost all of the clientele were engaged in the sex trade. Upon information and belief, the hotel is now closed.

**9. American Inn - Ontario**

269. Plaintiff was trafficked through the American Inn in Ontario as a minor from about 2005 through late 2006, and then as an adult from late 2006 through 2009. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for several days at a time.

270. At all relevant times, Defendant Jayeshbhai S. Shah as owner, the American Inn hotel, and the unnamed and unidentified employees thereof ("American Inn Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

271. At all relevant times, the above American Inn Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

272. At all relevant times, the above-described American Inn Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

64

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

273. At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hallways.

274. The hotel is laid out such that one must pass the front desk and hallways monitored by security cameras to access any of the rooms, giving the hotel employees plain view and direct knowledge of the trafficking circumstances.

275. There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

a. Plaintiff was obviously a minor;

b. On at least a dozen occasions, multiple rooms were booked as a block typically under Tom Roe's name, booked by Tom Roe, and paid for by Tom Roe;

c. Tom Roe or his accomplices and associates would stand guard outside the rooms and the hotels, were obviously armed, and frequently disciplined the sex trafficking victims in the hallways and prevented them from leaving;

d. Tom Roe would collect the cash—typically right after the johns left - in the hotel's hallways or just outside the front door;

e. Plaintiff was emaciated, rarely left without Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

f. Plaintiff was dressed provocatively;

g. On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day, either after walking by the front desk or through the back door when the hotel left it unlocked, but always in full view of the hotel's cameras;

h. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

     i.  Plaintiff was travelling with a group of women, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, exhibited bruises and other signs of physical violence, and were visibly drugged and exhibited physical signs of drug reactions from time to time, which the hotel staff witnessed; and

     j.  Tom Roe and his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring in the room, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the room, such as used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they entered the rooms.

276. The hotel staff were familiar with Tom Roe and Plaintiff and had no illusions about what was happening

277. The hotel owners were made aware of the likelihood of sex trafficking activity at the hotel from public statements as late as 2016.[25]

**10. Country Inn- Ontario**

278. Plaintiff was trafficked through the Country Inn - Ontario between about 2010 and 2014. Plaintiff, Tom Roe, and the others in their group stayed at this hotel for several days each month.

279. Between about 2010 and 2011, Defendant Grove Hospitality LLC as owner and operator, the County Inn, and the unnamed and unidentified employees thereof ("Country Inn Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

280. Between about 2011 and 2014, Defendants Angela Wu Shuyu (Shuyu Angela Wu) and K&A Global Investment LLC as owners, the Country Inn and the unnamed and

---

[25] https://www.yelp.com/biz/american-inn-ontario#reviews.

FIRST AMENDED COMPLAINT FOR DAMAGES       Case No. 5:24-cv-2350-AH-DTB

unidentified employees thereof (Country Inn Roes) formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

281. At all relevant times, the above Country Inn Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

282. At all relevant times, the above-described Country Inn Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

283. At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hallways.

284. The hotel is laid out such that one must check in with front desk to access any of the rooms, there are cameras throughout, and the room doors are clearly visible, giving the hotel employees direct knowledge of the trafficking circumstances.

285. There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

    a. On several dozen occasions over the years, multiple rooms were booked as a block typically under Tom Roe's name, booked by Tom Roe alone, and paid for by Tom Roe;

    b. Tom Roe or his accomplices and associates would stand guard outside the rooms or in the breezeway, were obviously armed, and frequently disciplined the sex trafficking victims in public and prevented them from leaving;

    c. Tom Roe or his accomplices would collect the cash—typically right after the johns left—in the hotel's hallway just outside the front door;

FIRST AMENDED COMPLAINT FOR DAMAGES      Case No. 5:24-cv-2350-AH-DTB

d.  Plaintiff was emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

e.  Plaintiff was dressed provocatively at all times;

f.  Plaintiff came and went without much in the way of possessions;

g.  On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day and at all times at night, either after walking by the front desk or through the back entrances, but always in full view of the hotel's employees and cameras;

h.  Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

i.  Plaintiff was travelling with a group of women—as many as five and as few as three—many of whom, like her, were emaciated, showed signs of heavy drug usage, dressed provocatively and exhibited bruises and other signs of physical violence; and

j.  Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring in the room, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they entered the rooms.

286.  The hotel staff were familiar with Tom Roe and Plaintiff and had no illusions about what was happening.

287.  The hotel and hotel owners have admitted they knew well that their hotels were being used as bases for exploitation and were made well aware of the likely sex

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

trafficking activity by the public posts and reviews about this hotel in particular.[26]

## 11. Ramada By Wyndham - Ontario

288. Plaintiff was trafficked through the Ramada by Wyndham in Ontario between about 2009 and approximately 2018. Plaintiff, Tom Roe, and the others in their group would stay at this motel for approximately five days of almost every month during that time.

289. Defendant Balgopal Investments Inc. as owner, along with Wyndham Hotels and Resorts Inc. and Ramada International Inc. (hereinafter "Wyndham Franchisors") as franchisors and owners of the Ramada brand, the Ramada hotel, and the unnamed and unidentified employees thereof ("Ramada Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

290. At all relevant times, the above Ramada Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

291. At all relevant times, the above-described Ramada Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

292. At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hallways.

293. The motel is laid out such that one must check in with the front desk to rent any of the rooms, the room doors are in full view of hotel employees, as is the parking right outside those doors, giving the hotel and its employees plain view and direct knowledge of the trafficking circumstances.

---

[26] See, e.g., https://www.yelp.com/biz/country-inn-ontario-ontario-2?start=30#reviews.

69

FIRST AMENDED COMPLAINT FOR DAMAGES               Case No. 5:24-cv-2350-AH-DTB

294. There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

      a. On dozens of occasions, multiple rooms were booked as a block typically under Tom Roe's name, booked by Tom Roe alone, and paid for by Tom Roe;

      b. Tom Roe or Tom Roe's accomplices and associates would stand guard outside the rooms, were obviously armed, and frequently disciplined the sex trafficking victims and prevented them from leaving;

      c. Tom Roe or his accomplices would collect the cash—typically right after the johns left—in the hotel's hallways or just outside the front door or in the common areas;

      d. Plaintiff was emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

      e. Plaintiff was dressed provocatively;

      f. Plaintiff never had large bags or suitcases—suggesting she had little in the way of possessions;

      g. On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day and at all times at night, either after walking by the front desk or front office, but always in full view of the hotel's cameras;

      h. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

      i. Plaintiff was travelling with a group of women, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, and exhibited bruises and other signs of physical violence;

FIRST AMENDED COMPLAINT FOR DAMAGES      Case No. 5:24-cv-2350-AH-DTB

j. Once, in or around 2016, while Plaintiff was having a conversation with a front desk clerk, Tom Roe grabbed her by the hair and dragged her outside, where he beat her senselessly in full view of all hotel staff. This brutal attack did not prevent the hotel from allowing Tom Roe to continue to book rooms over a dozen times afterwards; and

k. Tom Roe or his associates precluded hotel staff from entering the rooms while the sex trafficking was underway, and the motel staff must have noticed clear signs of commercial sex trafficking throughout the room, such as used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they entered the rooms.

295.   The hotel staff were familiar with Tom Roe and Plaintiff and had no illusions about what was happening, given how frequently and how long Tom Roe had used the hotel as a base for his trafficking.

296.   Ramada and Wyndham cannot claim to have been unaware of the situation given that in 2017, there were multiple shootings at this particular hotel, and at least one reportedly involving a dispute over non-payment to a trafficking victim who was receiving clients at the hotel.[27]

297.   The Ramada by Wyndham-Ontario was franchised by Defendants Wyndham Hotels & Resorts Inc., and Ramada International Inc., or their affiliates (hereinafter "Wyndham Franchisors), during the time Plaintiff was trafficked at the location.

298.   As part of the franchisor/franchisee contractual relationship, the Wyndham Franchisors did and still do exercise substantial control over Defendant Balgopal Investments Inc., as their franchisee, and were and are responsible for and have the contractual right to, among other things:

---

[27] https://www.ontarioca.gov/press-releases/ramada-inn-murder-suspects-arrested https://www.sbsun.com/2017/09/01/police-investigate-fatal-shooting-at-ontario-hotel/.

71

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

a. Create and define the safety standards that franchisees (i.e., Balgopal Investments Inc.) are supposed to maintain;

b. Clearly communicate those standards to franchisees (i.e., Balgopal Investments Inc.);

c. Create the materials for training franchisees (i.e., Balgopal Investments Inc.) and their employees;

d. Provide some or all of the training to franchisees (i.e., Balgopal Investments Inc.) or their employees;

e. Enforce the standards that franchisees (i.e., Balgopal Investments Inc.) are supposed to maintain;

f. Hold the franchisees (i.e., Balgopal Investments Inc.) to the standards that franchisees are supposed to maintain; and

g. Terminate and replace non-compliance franchisees (i.e., Balgopal Investments Inc.).

299. Because of this relationship, the Wyndham Franchisors have the right to control and in fact do control whether Balgopal Investments Inc. or their other franchisees take reasonable actions to prevent sex trafficking.

300. The Wyndham Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., Balgopal Investments Inc.) locations because of royalties, rents, increased visibility and goodwill and other monies subject to the Wyndham Franchisors' contractual relationship with Balgopal Investments Inc. or other franchisees.

301. The Wyndham Franchisors provide materials to train their franchisees, including Balgopal Investments Inc., about the warning signs for sex trafficking within the hotels and, upon information and belief, have control, either expressly or implied, over the hiring, control, and regulation of employees of Balgopal Investments Inc., and other franchisees.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

302. The Wyndham Franchisors, upon information and belief, tacitly continued participating in the venture profiting from the exploitation of Plaintiff and other women by Tom Roe at the Wyndham Franchisors' franchisee locations, including Balgopal Investments Inc.

303. The failure of the Wyndham Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including Balgopal Investments Inc., on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

304. Upon information and belief, the Wyndham Franchisors did nothing in the view of the police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant sex trade.

305. Upon information and belief, the Wyndham Franchisors did not ask franchisees, including Balgopal Investments Inc., and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking.

306. Upon information and belief, the Wyndham Franchisors did survey the hotels' guest population and activities, and yet failed to evaluate the likely sources of income for the hotel to determine whether the hotel's viability depended on sex trafficking and other criminal activity. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable, and discovered that the hotels were part of an illicit trafficking venture.

307. These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Wyndham Franchisors did nothing for eons.

308. The Wyndham Franchisors are part of the "ventures" involving several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at Balgopal Investments Inc. location, but also providing the training and supervision to their franchisees, including Balgopal Investments Inc., thereby providing actual and constructive

73

knowledge for the activities including Tom Roe's sex trafficking of Plaintiff at Balgopal Investments Inc., or the other franchisee locations.

309.    The Wyndham Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including Balgopal Investments Inc., while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

310.    The Wyndham Franchisors are or were based in New Jersey. The New Jersey Attorney General's office has released important information for hotel and motel owners and managers to train their staff to recognize human trafficking.[28]

311.    The California Attorney General's Office likewise has published ways to identify sex trafficking, including:

❖ Is not free to leave or come and go as he/she wishes.

❖ Is in the commercial sex industry and has a pimp/manager.

❖ Is unpaid.

❖ Works excessively long and/or unusual hours.

❖ Is not allowed breaks or suffers under unusual restrictions at work.

❖ Faces high security measures.

❖ [Appears] fearful, anxious, depressed, submissive, tense, or nervous/paranoid.

❖ Exhibits unusually fearful or anxious behavior after bringing up law enforcement.

❖ Avoids eye contact.

❖ Appears malnourished or shows signs of repeated exposure to harmful chemicals.

❖ Shows signs of physical and/or sexual abuse, physical restraint, confinement.

❖ Has few or no personal possessions.

❖ Is not in control of his/her own money, no financial records, or bank account.

---

[28] https://www.nj.gov/oag/dcj/humantrafficking/downloads/NJ-Human-Trafficking-Brochure.pdf.

74

❖ Is not allowed or able to speak for themselves (a third party may insist on being present and/or translating).

❖ Has numerous inconsistencies in his/her story

312.    The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

313.    These commonsense inquiries should have been obvious to the hotel owner defendants, including Balgopal Investments Inc., but also to the Wyndham Franchisors at all times.

75

314. The Wyndham Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[29]

315. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking." This was highlighted by the Wyndham Franchisors several years ago whereby they adopted more robust standards.[30]

316. The Wyndham Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the Wyndham Franchisors will start doing to combat it more effectively.

317. The Wyndham Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[31]

318. However, it still does not appear that much of what the Wyndham Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including Balgopal Investments Inc.'s location, through 2022 as the Wyndham Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

319. The Wyndham Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Wyndham Franchisors could continue to profit.

320. The Wyndham Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the Wyndham Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including Balgopal Investments

[29] See, e.g., https://www.tripadvisor.com/ShowUserReviews-g55857-d109100-r512045243-La_Quinta_Inn_Suites_by_Wyndham_Fort_Worth_City_View-Fort_Worth_Texas.html.

[30] Wyndham: https://investor.wyndhamhotels.com/news-events/press-releases/detail/126/wyndham-hotels-resorts-reinforces-efforts-to-combat-human.

[31] Wyndham: https://investor.wyndhamhotels.com/news-events/press-releases/detail/126/wyndham-hotels-resorts-reinforces-efforts-to-combat-human.

76

FIRST AMENDED COMPLAINT FOR DAMAGES             Case No. 5:24-cv-2350-AH-DTB

Inc., have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the Wyndham Franchisors' franchised premises.

321.   The Wyndham Franchisors have thus known about these red flags of sex trafficking and now acknowledge that they have the responsibility, opportunity, means, and capability of doing something about it.

322.   As such, it was incumbent on the Wyndham Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including Balgopal Investments Inc., from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

323.   By all appearances, the hotels at issue, including Balgopal Investments Inc., in this case would not survive financially without the sex trafficking business writ large.  The Wyndham Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the Wyndham Franchisors.

324.   Upon information and belief, the Wyndham Franchisors sent inspectors annually to grade each hotel, including Balgopal Investments Inc. Those in-person inspections would have alerted the Wyndham Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including Balgopal Investments Inc., were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors, who acted as agents of the Wyndham Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including Balgopal Investments Inc., but since nothing changed in the

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

sex trafficking and exploitation of Plaintiff, the Wyndham Franchisors acquiesced to their continued participation in a venture with Tom Roe.

325.    The Wyndham Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the Wyndham Franchisors' hotels, including Balgopal Investments Inc.'s location, to which their names are associated.

326.    Furthermore, Balgopal Investments Inc. hotel ventures and each of the Wyndham Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including Balgopal Investments Inc., about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the Wyndham Franchisors' franchisees, including Balgopal Investments Inc., among other similar things.

**12.    Baymont by Wyndham – Ontario and Econo Lodge- Ontario**

327.    Plaintiff was trafficked through Baymont (F/K/A Econo-Lodge) between about 2009 and 2018. Plaintiff, Tom Roe, and the others in their group would stay at this hotel for approximately four to seven days each month.

328.    Defendant SOL Hospitality Group LLC as owner, along with Wyndham Hotels and Resorts, Inc. and Choice Hotels International as franchisors, the Baymont hotel/ Econo Lodge, and the unnamed and unidentified employees thereof ("Baymont/Econo Roes") formed a business venture that participated in Tom Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

329.    Upon information and belief, Defendant SOL Hospitality Group LLC, switched hotel brands from Econo Lodge, a Choice Hotels brand, to Baymont by Wyndham in or around 2018, which was during the period that Plaintiff was trafficked by Tom Roe, allowing the venture to continue through the name and franchisor changes.

FIRST AMENDED COMPLAINT FOR DAMAGES                    Case No. 5:24-cv-2350-AH-DTB

330.    At all relevant times, the above Baymont/Econo Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

331.    At all relevant times, the above described Baymont/Econo Defendants had a continuous or repeat business relationship with Tom Roe wherein they rented multiple rooms to Tom Roe at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

332.    At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hallways.

333.    The hotel is laid out such that one must pass the front desk to access rooms, giving the hotel employees plain view and direct knowledge of the trafficking circumstances.

334.    There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because

   a. On dozens of occasions, multiple rooms were booked as a block typically under Tom Roe's name, booked by Tom Roe alone, and paid for by Tom Roe;

   b. Tom Roe or his accomplices and associates would stand guard outside the rooms and the hotels, were obviously armed, and frequently disciplined the sex trafficking victims in the hallways and prevented them from leaving;

   c. Tom Roe would collect the cash—typically right after the johns left—in the hotel's hallways or just outside the front door;

   d. Plaintiff was emaciated, rarely left without Tom Roe or his accomplices escorting her, and she was never allowed to speak to other people or with hotel staff;

   e. Plaintiff was dressed provocatively;

   f. Plaintiff never came in with much in the way of possessions;

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

g. On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms) one by one throughout the day and at all times at night, either after walking by the front desk or through the back entrance that the hotel made available, but always in full view of the hotel's cameras;

h. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

i. Plaintiff was travelling with a group of women, many of whom, like her, were dressed provocatively, emaciated, had no possessions, showed signs of heavy drug usage, and frequently exhibited bruises and other signs of physical violence; and

j. Tom Roe or his associates frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring in the room, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they entered the rooms.

335. The hotel staff were familiar with Tom Roe and his business, and with Plaintiff who was frequently with him, and had no illusions about what was happening.

336. A front-desk employee, who was known to Plaintiff as "Seg," had a relationship with one of the women in Tom Roe's sex trafficking venture, and would stand watch and warn Tom Roe of police or other potential issues in exchange for using this particular woman in Tom Roe's sex trafficking venture as compensation for assisting Tom Roe.

337. Around 2015, while staying at the hotel, Tom Roe beat another sex trafficking victim so severely that she had visible eye contusions, to the point where the group was asked to leave by the hotel and had to take up temporary residence at another hotel nearby.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

However, the very next time Tom Roe tried to check them into the Baymont/Econo Defendant, they were allowed to and did so many times thereafter.

338.   Wyndham and Choice Hotels again cannot claim not to have known about the situation given the myriad of public postings about the hotel serving as a haven for likely sex trafficking going all the way back to as late as 2013.[32]

339.   The Econo Lodge-Ontario was franchised by Defendant Choice Hotel International Inc., or its affiliates (hereinafter "Choice Franchisors), during the time Plaintiff was trafficked at the location.

340.   As part of the franchisor/franchisee contractual relationship, the Choice Franchisors did and still do exercise substantial control over Defendant SOL Hospitality Group LLC, as their franchisee, until or around 2018 and were responsible for and had the contractual right to, among other things:

a. Create and define the safety standards that franchisees (i.e., SOL Hospitality Group LLC) are supposed to maintain;

b. Clearly communicate those standards to franchisees (i.e., SOL Hospitality Group LLC);

c. Create the materials for training franchisees (i.e., SOL Hospitality Group LLC) and their employees;

d. Provide some or all of the training to franchisees (i.e., SOL Hospitality Group LLC) or their employees;

e. Enforce the standards that franchisees (i.e., SOL Hospitality Group LLC) are supposed to maintain;

f. Hold the franchisees (i.e., SOL Hospitality Group LLC) to the standards that franchisees are supposed to maintain; and

g. Terminate and replace non-compliance franchisees (i.e., SOL Hospitality Group LLC).

---

[32] See also https://www.yelp.com/biz/baymont-by-wyndham-ontario-ontario.
see also https://www.tripadvisor.com/ShowUserReviews-g32823-d77645-r889126189-Baymont_by_Wyndham_Ontario-Ontario_California.html.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

341. Because of this relationship, the Choice Franchisors have the right to control and in fact do control whether SOL Hospitality Group LLC or their other franchisees take reasonable actions to prevent sex trafficking.

342. The Choice Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., SOL Hospitality Group LLC) locations because of royalties, rents, and other monies subject to the Choice Franchisors' contractual relationship with SOL Hospitality Group LLC or other franchisees.

343. The Choice Franchisors provide materials to train their franchisees, including SOL Hospitality Group LLC, about the warning signs for sex trafficking within the hotels and, upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of SOL Hospitality Group LLC, and other franchisees.

344. The Choice Franchisors, upon information and belief, tacitly allowed Tom Roe to allow their venture with Tom Roe and to continue participating in the venture to continue profiting from the exploitation of Plaintiff and other women by Tom Roe at the Choice Franchisors' franchisee locations, including SOL Hospitality Group LLC.

345. The failure of the Choice Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including SOL Hospitality Group LLC, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

346. Upon information and belief, the Choice Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the Choice Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including SOL Hospitality Group LLC, and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

FIRST AMENDED COMPLAINT FOR DAMAGES                    Case No. 5:24-cv-2350-AH-DTB

347.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Choice Franchisors did nothing for eons. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable, and discovered that the hotels were part of an illicit trafficking venture.

348.    The Choice Franchisors are part of the "ventures" involving several hotels— owning and operating some during the relevant period that Plaintiff was trafficked at SOL Hospitality Group LLC location, but also providing the training and supervision to their franchisees, including SOL Hospitality Group LLC, thereby providing actual and constructive knowledge for the activities including Tom Roe's sex trafficking of Plaintiff at SOL Hospitality Group LLC, or the other franchisee locations.

349.    The Choice Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including SOL Hospitality Group LLC, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

350.    The Choice Franchisors are or were based in Maryland. The Maryland Governor and Department of Human Services have long published warnings for identifying sex trafficking.[33]

351.    The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

---

[33] https://dhs.maryland.gov/child-protective-services/sex-trafficking/recognize-the-signs/.

83

FIRST AMENDED COMPLAINT FOR DAMAGES                Case No. 5:24-cv-2350-AH-DTB

- ❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?
- ❖ Does the person have bruises in various stages of healing?
- ❖ Is the person fearful, timid, or submissive?
- ❖ Does the person show signs of having been denied food, water, sleep, or medical care?
- ❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?
- ❖ Does the person appear to be coached on what to say?
- ❖ Is the person living in unsuitable conditions?
- ❖ Does the person lack personal possessions and appear not to have a stable living situation?
- ❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

352.    These commonsense inquiries should have been obvious to the hotel owner defendants, including SOL Hospitality Group LLC, but also to the Choice Franchisors at all times.

353.    The Choice Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[34]

354.    The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking."  This was highlighted by the Choice Franchisors several years ago whereby they adopted more robust standards.[35]

---

[34] see e.g., https://www.tripadvisor.com/ShowUserReviews-g54358-d23722644-r945515391-Country_Inn_Suites_By_Radisson-Murrells_Inlet_South_Carolina.html.
[35] Choice: https://media.choicehotels.com/2024-04-25-Choice-Hotels-International-Unveils-Year-of-Sustainability-Milestones-in-Newly-Published-2023-Environmental,-Social,-and-Governance-Report.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

355. The Choice Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the Choice Franchisors will start doing to combat it more effectively.

356. The Choice Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[36]

357. However, it still does not appear that much of what the Choice Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including SOL Hospitality Group LLC's location, through 2022 as the Choice Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

358. The Choice Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Choice Franchisors could continue to profit.

359. The Choice Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the Choice Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including SOL Hospitality Group LLC, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the Choice Franchisors' franchised premises.

360. The Choice Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

361. As such, it was incumbent on the Choice Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including SOL Hospitality

---

[36] Choice: https://media.choicehotels.com/2024-04-25-Choice-Hotels-International-Unveils-Year-of-Sustainability-Milestones-in-Newly-Published-2023-Environmental,-Social,-and-Governance-Report.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

Group LLC, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

362.    By all appearances, the hotels at issue, including SOL Hospitality Group LLC, in this case would not survive financially without the sex trafficking business writ large.  The Choice Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the Choice Franchisors.

363.    Upon information and belief, the Choice Franchisors sent inspectors annually to grade each hotel, including SOL Hospitality Group LLC. Those in-person inspections would have alerted the Choice Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including SOL Hospitality Group LLC, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors, who acted as agents of the Choice Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including SOL Hospitality Group LLC, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the Choice Franchisors acquiesced to their continued participation in a venture with Tom Roe.

364.    The Choice Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the Choice Franchisors' hotels, including SOL Hospitality Group LLC's location, to which their names are associated.

365.    Furthermore, SOL Hospitality Group LLC's hotel ventures and each of the Choice Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including SOL Hospitality Group LLC, about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the Choice

86

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

Franchisors' franchisees, including SOL Hospitality Group LLC, among other similar things.

366.    The Baymont by Wyndham-Ontario was franchised by Defendants, Wyndham Hotels & Resorts Inc., and Ramada International Inc., or their affiliates (hereinafter "Wyndham Franchisors), during the time of the Plaintiff was trafficked at the location.

367.    As part of the franchisor/franchisee contractual relationship, the Wyndham Franchisors since in or around 2018 did and still do exercise substantial control over Defendant SOL Hospitality Group LLC, as their franchisee, and were and are responsible for and have the contractual right to, among other things:

      a.  Create and define the safety standards that franchisees (i.e., SOL Hospitality Group LLC) are supposed to maintain;

      b.  Clearly communicate those standards to franchisees (i.e., SOL Hospitality Group LLC);

      c.  Create the materials for training franchisees (i.e., SOL Hospitality Group LLC) and their employees;

      d.  Provide some or all of the training to franchisees (i.e., SOL Hospitality Group LLC) or their employees;

      e.  Enforce the standards that franchisees (i.e., SOL Hospitality Group LLC) are supposed to maintain;

      f.  Hold the franchisees (i.e., SOL Hospitality Group LLC) to the standards that franchisees are supposed to maintain; and

      g.  Terminate and replace non-compliance franchisees (i.e., SOL Hospitality Group LLC).

368.    Because of this relationship, the Wyndham Franchisors have the right to control and in fact do control whether SOL Hospitality Group LLC or their other franchisees take reasonable actions to prevent sex trafficking.

369.    The Wyndham Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., SOL Hospitality Group LLC)

87

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

locations because of royalties, rents, and other monies subject to the Wyndham Franchisors' contractual relationship with SOL Hospitality Group LLC or other franchisees.

370.    The Wyndham Franchisors provide materials to train their franchisees, including SOL Hospitality Group LLC, about the warning signs for sex trafficking within the hotels and, upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of SOL Hospitality Group LLC, and other franchisees.

371.    The Wyndham Franchisors, upon information and belief, tacitly continued participating in the venture profiting from the exploitation of Plaintiff and other women by Tom Roe at the Wyndham Franchisors' franchisee locations, including SOL Hospitality Group LLC.

372.    The failure of the Wyndham Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including SOL Hospitality Group LLC, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

373.    Upon information and belief, the Wyndham Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the Wyndham Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including SOL Hospitality Group LLC, and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose. As part of any annual review, they would have looked at the cash versus credit receipts, and the reported profitability of the hotels versus the fact that the hotels continued to be viable, and discovered that the hotels were part of an illicit trafficking venture.

374.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Wyndham Franchisors did nothing for eons.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

375.   The Wyndham Franchisors are part of the "ventures" involving several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at SOL Hospitality Group LLC location, but also providing the training and supervision to their franchisees, including SOL Hospitality Group LLC, thereby providing actual and constructive knowledge for the activities including Tom Roe's sex trafficking of Plaintiff at SOL Hospitality Group LLC, or the other franchisee locations.

376.   The Wyndham Franchisors participated in a venture with Tom Roe by permitting Tom Roe to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through his constant physical abuse in the presence of hotel employees at the franchisee locations, including SOL Hospitality Group LLC, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

377.   The Wyndham Franchisors are or were based in New Jersey. The New Jersey Attorney General's Office has released important information for hotel and motel owners and managers to train their staff to recognize human trafficking.[37]

378.   The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

---

[37] https://www.nj.gov/oag/dcj/humantrafficking/downloads/NJ-Human-Trafficking-Brochure.pdf.

89

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

379. The California Attorney General's Office likewise has published ways to identify sex trafficking, including:

❖ Is not free to leave or come and go as he/she wishes.

❖ Is in the commercial sex industry and has a pimp/manager.

❖ Is unpaid.

❖ Works excessively long and/or unusual hours.

❖ Is not allowed breaks or suffers under unusual restrictions at work.

❖ Faces high security measures.

❖ [Appears] fearful, anxious, depressed, submissive, tense, or nervous/paranoid.

❖ Exhibits unusually fearful or anxious behavior after bringing up law enforcement.

❖ Avoids eye contact.

❖ Appears malnourished or shows signs of repeated exposure to harmful chemicals.

❖ Shows signs of physical and/or sexual abuse, physical restraint, confinement.

❖ Has few or no personal possessions.

❖ Is not in control of his/her own money, no financial records, or bank account.

❖ Is not allowed or able to speak for themselves (a third party may insist on being present and/or translating).

90

❖ Has numerous inconsistencies in his/her story

380.    These commonsense inquiries should have been obvious to the hotel owner defendants, including SOL Hospitality Group LLC, but also to the Wyndham Franchisors at all times, even without having to have been published.

381.    The Wyndham Franchisors cannot say that they have been unaware that their hotels, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[38]

382.    The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking."  This was highlighted by the Wyndham Franchisors several years ago whereby they adopted more robust standards.[39]

383.    The Wyndham Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the Wyndham Franchisors will start doing to combat it more effectively.

384.    The Wyndham Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[40]

385.    However, it still does not appear that much of what the Wyndham Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including SOL Hospitality Group LLC's location, through 2022 as the Wyndham Franchisors permitted the venture to continue so they could continue benefiting financially from Tom Roe's actions.

---

[38] See, e.g., https://www.tripadvisor.com/ShowUserReviews-g55857-d109100-r512045243-La_Quinta_Inn_Suites_by_Wyndham_Fort_Worth_City_View-Fort_Worth_Texas.html.

[39] Wyndham: https://investor.wyndhamhotels.com/news-events/press-releases/detail/126/wyndham-hotels-resorts-reinforces-efforts-to-combat-human.

[40] Wyndham: https://investor.wyndhamhotels.com/news-events/press-releases/detail/126/wyndham-hotels-resorts-reinforces-efforts-to-combat-human.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

386.    The Wyndham Franchisors' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Wyndham Franchisors could continue to profit.

387.    The Wyndham Franchisors' lack of action to stop Tom Roe and acquiesced participation in the venture, despite the Wyndham Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including SOL Hospitality Group LLC, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the Wyndham Franchisors' franchised premises.

388.    The Wyndham Franchisors have thus acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

389.    As such, it was incumbent on the Wyndham Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to Tom Roe and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including SOL Hospitality Group LLC, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

390.    By all appearances, the hotels at issue, including SOL Hospitality Group LLC, in this case would not survive financially without the sex trafficking business writ large.  The Wyndham Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the Wyndham Franchisors.

391.    Upon information and belief, the Wyndham Franchisors sent inspectors annually to grade each hotel, including SOL Hospitality Group LLC. Those in-person inspections would have alerted the Wyndham Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including SOL Hospitality Group LLC, were

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors who acted as agents of the Wyndham Franchisors provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including SOL Hospitality Group LLC, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the Wyndham Franchisors acquiesced to their continued participation in a venture with Tom Roe.

392. The Wyndham Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the Wyndham Franchisors' hotels, including SOL Hospitality Group LLC's location, to which their names are associated.

393. Furthermore, SOL Hospitality Group LLC hotel ventures and each of the Wyndham Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including SOL Hospitality Group LLC, about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the Wyndham Franchisors' franchisees, including SOL Hospitality Group LLC, among other similar things.

## IV.

## CAUSES OF ACTION

394. All conditions precedent have been satisfied.

395. All of the aforementioned factual averments in this Amended Complaint are incorporated by reference within each of the following causes of actions.

**A. COUNT ONE: VIOLATION OF FEDERAL ANTI-TRAFFICKING STATUTE (18 U.S.C. § 1581 ET SEQ.)**

396. Plaintiff incorporates the factual averments in this Amended Complaint as if fully set forth herein.

397. Defendants have each (and among each of the Ventures identified above, jointly and severally) violated the Victims of Trafficking and Violence Protection Act, 18

93

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

U.S.C. § 1581 *et seq.*, ("TVPRA") and therefore are liable to Plaintiff for compensatory damages, punitive damages, attorneys' fees, and costs.

398. The Victims of Trafficking and Violence Protection Act of 2000, Public Law 106-386, as amended, declares as illegal the trafficking in persons, including forced labor, involuntary servitude, slavery, and sex trafficking.

399. In addition to being a victim of a "severe form[] of trafficking" as it is defined under 22 U.S.C.S. §7102(11), Plaintiff was also "caused to engage in commercial sex act[s]" before she attained the age of 18 and for years thereafter. *See* 18 U.S.C.S. §1591(a).

400. 18 U.S.C. § 1591(a) makes it a crime to knowingly benefit, either financially or by receiving anything of value from participating in a venture that engages the trafficking of children, or the trafficking of adults by force, threat or coercion. 18 U.S.C. § 1591(a).

401. 18 U.S.C. § 1593A specifically makes it a violation of federal law to benefit financially or receive anything of value, from participating in a venture which has engaged in any act in violation of this chapter, with knowing or in reckless disregard of the fact that the venture has engaged in such violation.

402. 18 U.S.C. § 1594 makes it a violation of federal law to attempt to or conspire with another to violate certain statutes, including 18 U.S.C. § 1589, which criminalizes the obtaining of labor (or knowingly benefitting financially from participating in such a scheme when they knew or should have known of the trafficking) to obtain labor by a person by means of force, threats of force or physical restraint, serious harm or threats of serious harm, or the abuse of law or the legal process.

403. 18 U.S.C. § 1590 makes it a violation of federal law for one to, among other things, "harbor" any venture that involves a person being trafficked for labor or services in violation of the chapter.

404. 22 U.S.C § 7102(12) defines "sex trafficking" as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

FIRST AMENDED COMPLAINT FOR DAMAGES        Case No. 5:24-cv-2350-AH-DTB

405.    To "participat[e] in a venture" for purposes of the violation means "knowingly assisting, supporting, or facilitating" sex trafficking where "knowingly" means with awareness or being recklessly unaware. 18 U.S.C. § 1591(e)(4). A violation of this section includes "[w]hoever knowingly… benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act in violation of paragraph [(a)](1)" 18 U.S.C. § 1591(a)(2) *compare with* 18 U.S.C. § 1591(e)(4); *see also* 18 U.S.C. § 1591(a)(1) ("Whoever knowingly… recruits, entices, harbors, transports, provides obtains, advertises, maintains, patronizes, or solicits by any means a person…").

406.    18 U.S.C. § 1594(g) also declares that any such scheme "shall be considered an organized criminal activity or other serious offense..."

407.    18 U.S.C. § 1595 provides that Plaintiff may bring a civil action against each Defendant because each knowingly benefited, or attempted or conspired to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter, and may recover damages and reasonable attorneys' fees.

408.    Each of the hotel ventures knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purpose of having sex for money because, at a minimum, they harbored the sex trafficking activity.

409.    They knew or should have known that even as an adult, she was not doing so of her free will and free from coercion—and their failure to know was the result of their own recklessness.

410.    Each Defendant benefited financially in at least the following ways:

i.    Each Defendant hotel venture made money not only from Plaintiff's exploitation and victimization, but from the business model overall by harboring sex trafficking victims;

ii.    Each Defendant hotel venture was able to rely on a constant stream of income not just from Tom Roe's trafficking of Plaintiff and others and

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

their room rentals but from the halo effect of others being a reliable source of income;

   iii.  Each Defendant hotel venture benefited financially from realizing the benefit of their hotel asset being more valuable on a financial basis due to the income that was generated;

   iv.  Each of the Defendants, including Franchisor Defendants (G6 Franchisors, Wyndham Franchisors, and Choice Franchisors), benefited financially from the royalites that were paid as part of the above-noted financial benefits to the hotels themselves, including the appreciation in the value of the franchisor's name and goodwill, and the fact that the brand was being projected to the public through signage and other advertisements.

411. There is no doubt that Tom Roe would not have been able to carry out his trafficking scheme of Plaintiff without the participation of Defendants. Therefore, each Defendant is liable under Section 1595 of the TVPRA.

412. Each Defendant hotel venture was using a facility or means of interstate commerce, such as interstate wire communications via the internet and banking system, and so owned, managed or operated an interactive computer service for all facets of its business, including performing banking, reservation, video surveillance, and communication with guests and non-guests.

413. Each Defendant hotel venture promoted or intentionally facilitated prostitution in its hotels, booking rooms and accepting payment for them year in and year out, with full knowledge that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of Plaintiff, then they were reckless in their lack of awareness.

414. Plaintiff is entitled to the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the 20 years she lost since she was first sex trafficked as a teenager; the fact that she was not able to make any money or have the

chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame and mental anguish from being a sex trafficking victim; and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries, including, but not limited to, her knocked out teeth and broken arm.

415.    Plaintiff is further entitled to attorneys' fees for bringing this claim, as well as punitive damages and restitution.

416.    Plaintiff pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act, Plaintiff's incapacity and inability to bring a claim until she became free of Tom Roe's influence and threats which further tolls the statute of limitation, and because Defendants are estopped from raising the statute of limitations as a defense and any statute is equitably tolled because Plaintiff was unaware of her injury.

**B.  COUNT TWO: VIOLATION OF PROMOTION OR FACILITATION OF SEX TRAFFICKING STATUTE (18 U.S.C. § 2421A ET SEQ.)**

417.    Plaintiff incorporates the factual averments in this Amended Complaint as if fully set forth herein.

418.    Defendants have each (and among them jointly and severally) violated the federal statute for promoting or facilitating prostitution and the recklessly disregard sex trafficking of victims, 18 U.S.C. § 2421A *et seq.*, and therefore are liable to Plaintiff for compensatory damages, punitive damages, attorneys' fees, and costs.

419.    18 U.S.C. § 2421A(b) make it a violation of federal law for one to use an interactive computer service (or who attempts to do so) "with the intent to promote or facilitate the prostitution of another person" and acts in reckless disregard that such conduct contributed to sex trafficking.

420.    18 U.S.C. § 2421A(c) authorizes a civil action separately from § 1595 for damages and attorneys' fees for any person injured by reason of a violation of § 2421A(b), and subsection (d) requires the imposition of mandatory restitution.

97

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

421.   Section 230 of the Communications Decency Act provides no defense to an action under § 2421A(b) and (c).

422.   Each of the hotel ventures knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purpose of having sex for money. They knew or should have known that even as an adult, she was not doing so of her free will and free from coercion—and their failure to know was the result of their own recklessness.

423.   Each Defendant benefited financially in at least the following ways:

    i.   Each Defendant hotel venture made money not only from Plaintiff but from the business model overall by harboring sex trafficking victims;

    ii.   Each Defendant hotel venture was able to rely on a constant stream of income not just from Tom Roe's trafficking of Plaintiff and others and their room rentals but from the halo effect of others being a reliable source of income;

    iii.   Each Defendant hotel venture benefited financially from realizing the benefit of their hotel asset being more valuable on a financial basis due to the income that was generated;

    iv.   Each of the Defendants, including the Franchisor Defendants (G6 Franchisors, Wyndham Franchisors, and Choice Franchisors), benefited financially from the royalites that were paid as part of the above-noted financial benefits to the hotels themselves, including the appreciation in the value of the franchisor's name and goodwill, and the fact that the brand was being projected to the public through signage and other advertisements.

424.   There is no doubt that Tom Roe would not have been able to carry out his trafficking scheme of Plaintiff without the participation of Defendants.   Therefore, each Defendant is liable under 18 U.S.C. 2421A *et seq*.

425.   Each Defendant hotel venture "owns, manages, or operates an interactive computer service" and using a facility or means of interstate commerce, such as interstate

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

wire communications via the internet and banking system, and did so in connection with interactive computer service for all facets of its business, including performing banking, reservation, room booking, accounting, room management, promotions and advertising, video surveillance, and communication with guests and non-guests.

426.    The G6 Franchisors, upon information and belief, require their franchisees to utilize a proprietary reservation system that interfaces with internet advertising and central telephone operators used and owned by G6. They further utilize an interactive computer service for reporting, payments, and accounting processes that their franchisees must use.

427.    The Wyndham Franchisors, upon information and belief, require their franchisees to utilize a proprietary reservation system that interfaces with internet advertising and central telephone operators used and owned by Wyndham and its subsidiaries. They further utilize an interactive computer service for reporting, payments, and accounting processes that their franchisees must use.

428.    The Choice Franchisors, upon information and belief, require their franchisees to utilize a proprietary reservation system that interfaces with internet advertising and central telephone operators used and owned by Choice. They further utilize an interactive computer service for reporting, payments, and accounting processes that their franchisees must use.

429.    Each of the franchisee and non-franchise hotel ventures owned their own interactive computer systems through which they operated their own room accounting, websites, general accounting, banking, management, and advertising.

430.    Each Defendant hotel venture promoted or intentionally facilitated prostitution in its hotels, booking rooms and accepting payment for them year in and year out, with full knowledge that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of Plaintiff, then they were reckless in their lack of awareness.

431.    Plaintiff is entitled to the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the 20 years she lost since she was first sex trafficked as a teenager; the fact that she was not able to make any money or have the

FIRST AMENDED COMPLAINT FOR DAMAGES              Case No. 5:24-cv-2350-AH-DTB

chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame and mental anguish from being a sex trafficking victim; and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries, including, but not limited to, her knocked out teeth and broken arm.

432.    Plaintiff is further entitled to attorneys' fees for bringing this claim, as well as punitive damages and restitution.

433.    Plaintiff pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act, Plaintiff's incapacity and inability to bring a claim until she became free of Tom Roe's influence and threats which further tolls the statute of limitation, and because Defendants are estopped from raising the statute of limitations as a defense and any statute is equitably tolled because Plaintiff was unaware of her injury.

## C. COUNT THREE: CALIFORNIA CIVIL CODE § 52.5 (AGAINST ALL DEFENDANTS)

434.    Plaintiff incorporates the factual averments in this Amended Complaint as if fully set forth herein.

435.    Plaintiff is the victim of sex trafficking as defined in California Penal Code § 236.1, and is entitled to bring a claim under Cal. Civ. Code § 52.5(a), (b) and (c).

436.    Cal. Civil Code § 52.5 incorporates Cal. Penal Code § 236.1 as the predicate violation(s), and generally follows the same scheme set forth in the Federal Victims of Trafficking and Violence Protection Act. *See* Cal. Penal Code § 236.1(g) ("The Legislature finds that the definition of human trafficking in this section is equivalent to the federal definition of a severe form of trafficking found in Section 7102(11) of Title 22 of the United States Code.").[41]

437.    Each Defendant hotel venture participated in Tom Roe's scheme, plan, or pattern of sex trafficking.

---

[41] "The term "severe forms of trafficking in persons" means—(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or (B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. § 7102(11).

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

438.    Each Defendant hotel venture knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purpose of having sex for money, and that even as an adult, she was not doing so of her free will free and from coercion.

439.    Each Defendant benefited financially in at least the following ways:

      a.    Each Defendant hotel venture made money not only from Plaintiff but from the business model overall by harboring sex trafficking victims;

      b.    Each Defendant hotel venture was able to rely on a constant stream of income not just from Tom Roe's trafficking of Plaintiff and others and their room rentals but from the halo effect of others being a reliable source of income;

      c.    Each Defendant hotel venture benefited financially from realizing the benefit of their hotel asset being more valuable on a financial basis due to the income that was generated.

      d.    Each of the Defendants, including the Franchisor Defendants (G6 Franchisors, Wyndham Franchisors, and Choice Franchisors), benefited financially from the royalites that were paid as part of the above-noted financial benefits to the hotels themselves, including the appreciation in the value of the franchisor's name and goodwill, and the fact that the brand was being projected to the public through signage and other advertisements.

440.    There is no doubt that Tom Roe would not have been able to carry out his trafficking scheme of Plaintiff without the participation of Defendants.

441.    Each Defendant hotel venture was using a facility or means of interstate commerce, such as interstate wire communications via the internet and banking system, and so owned, managed or operated an interactive computer service for all facets of its business, including performing banking, reservation, video surveillance, and communication with guests and non-guests.

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

442. Each Defendant hotel venture intentionally facilitated or knowingly promoted sex trafficking in its hotels with full knowledge that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of Plaintiff, then they were reckless in their lack of awareness.

443. Each Defendant is therefore liable to Plaintiff for the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the twenty years she lost since she was first sex trafficked as a teenager and the fact that she was not able to make any money; the fact that she never had the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame, and mental anguish from being a sex trafficking victim; and the pain, suffering and physical scars of her plight and her extreme emotional distress and physical injuries, including, but not limited to, her knocked out teeth and broken arm.

444. Plaintiff is further entitled to attorneys' fees and actual costs for bringing this claim, as well as treble damages, punitive damages, and restitution.

445. Plaintiff pleads that this action is timely as to all pleaded occurrences due to Plaintiff's incapacity and inability to bring a claim until she became free of Tom Roe's influence and threats, due to the continuing tort doctrine, and because Defendants are estopped from raising the statute of limitations as a defense. Thus, Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable tolling, estoppel and under California Civil Code § 52.5(c), (d), and (e).

## D. COUNT FOUR: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)

446. Plaintiff incorporates the factual averments in this Amended Complaint as if fully set forth herein.

447. At all times relevant, each of the Defendant hotel ventures acted through their agents and employees, and the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors were the agents of their respective franchisee hotels (or vice-versa), and their acts and omissions were all in the scope of their employment or agency.

102

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

448. Because Plaintiff was a hotel guest at each hotel venture's respective hotel property, each Defendant had a duty of care to take reasonable precautions not to harbor or provide a safe haven for the sex trade and thus sex trafficking. Without limiting the generality of the foregoing, Defendants had a duty to:

    a. Have knowledge of the signs of sex trafficking;

    b. Have an awareness of the degree of prostitution taking place in their hotels;

    c. Recognize when women or underage girls could be the victims of sex trafficking;

    d. Provide adequate incentives to hotel employees not to acquiesce to or, worse, facilitate the sex trade in their hotels;

    e. Provide adequate training to hotel employees to avoid facilitating sex trade businesses and prostitution in their hotels in states where prostitution is illegal;

    f. Properly train employees for dealing with suspected prostitution or sex-trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

    g. Properly monitor and record their hotels' public areas via cameras to ensure the safety of their guests; and

    h. Recognize when a guest is under the influence of substances or otherwise incapacitated to the point of not being in control of themselves and, therefore, unable to escape or consent to any sexual activity.

449. Each Defendant breached their duty.

450. Each Defendant knew or should have known of the risks to Plaintiff.

451. Each Defendant knew or should have known of the emotional distress and abuse suffered by Plaintiff due to the force, manipulation, and exploitation by Tom Roe in the presence of each Defendant, or their agents, servants, or employees, in the sex trafficking plan, scheme, or venture.

452. At all times herein mentioned, Defendants and each of them knew of the regulations and laws cited herein and knew that the wellbeing and health of their guests were

FIRST AMENDED COMPLAINT FOR DAMAGES      Case No. 5:24-cv-2350-AH-DTB

at risk whenever they failed to meet such duties.

453. Each Defendant hotel venture knew or should have known that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to Plaintiff and others like her.

454. Each Defendants' actions (whether directly or through their agents or employees) were done with knowledge or reckless disregard of what was occurring to Plaintiff, and Defendants' employees' active participation in allowing Plaintiff to be used in the sex trade and sex trafficked is outrageous conduct. Defendants' conduct alleged herein demonstrates reckless disregard for Plaintiff, her health and safety, and her plight. Thus, Defendants' despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

455. As a further result of Defendants' conduct, Plaintiff was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness, and desperation for *years.*

456. Each Defendant acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was being subjected to Tom Roe's abusive conduct. Each Defendant was well aware of the propensity for abuse and violence taking place in their hotels.

457. Plaintiff has suffered almost two decades' worth of severe emotional distress, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with it for the rest of her life. She lacks the means and insurance to seek proper treatment. Each Defendant's acts and omissions were a substantial factor in causing Plaintiff's severe emotional distress.

458. Each Defendant's acts or omissions were the result of oppression or malice against Plaintiff because they were recklessly indifferent to Plaintiff's wellbeing.

459. Plaintiff pleads that this action is timely as to all pleaded occurrences due to Plaintiff's incapacity and inability to bring a claim until she became free of Tom Roe's influence and threats, due to the continuing tort doctrine, and because Defendants are

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

estopped from raising the statute of limitations as a defense. Thus, Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable tolling, estoppel, and under California Civil Code § 52.5(c), (d), and (e).

460. Plaintiff seeks all compensable damages, punitive damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

## E. COUNT FIVE: NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)

461. Plaintiff incorporates the factual averments in this Amended Complaint as if fully set forth herein.

462. Each Defendant owed Plaintiff a duty of care to take reasonable measures to ensure that she was not being subjected to sex trafficking and criminal abuse, including physical and mental abuse, on their premises.

463. Each Defendant breached this duty.

464. At all times relevant, each of the Defendant hotel ventures acted through their agents and employees, and the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors were the agents of their respective franchisee hotels (or vice-versa), and their acts and omissions were all in the scope of their employment or agency.

465. Because Plaintiff was a hotel guest at each hotel venture's respective hotel property, each Defendant had a duty of care to take reasonable precautions not to harbor or provide a safe haven for sex trafficking or forced prostitution. Without limiting the generality of the foregoing, Defendants had a duty to:

    a. Have knowledge of the signs of sex trafficking;

    b. Have an awareness of the degree of the sex trade businesses taking place in their hotels;

    c. Recognize when women or underage girls could be the victims of sex trafficking;

    d. Provide adequate incentives to hotel employees not to acquiesce to or, worse, facilitate the sex trade in their hotels;

    e. Provide adequate training to hotel employees to avoid facilitating prostitution

105

FIRST AMENDED COMPLAINT FOR DAMAGES    Case No. 5:24-cv-2350-AH-DTB

in their hotels in states where prostitution is illegal;

f.  Properly train employees for dealing with suspected prostitution or sex-trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

g.  Properly monitor and record their hotels' public areas via cameras to ensure the safety of their guests; and

h.  Recognize when a guest is under the influence of substances or otherwise incapacitated to the point of not being in control of themselves and, therefore, unable to escape or consent to any sexual activity.

466.  Each Defendant knew or should have known of the risks to Plaintiff.  At all times herein mentioned, Defendants and each of them knew of the need for the regulations and laws and that the lives and health of their guests were at risk whenever they failed to meet such duties.

467.  Each Defendant hotel venture knew or should have known that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to Plaintiff and others like her.

468.  Each Defendant's actions or omissions (whether directly or through their agents or employees) were done with negligent disregard of what was occurring to Plaintiff, and Defendants' employees' outrageous conduct in allowing Plaintiff to be prostituted or sex trafficked. Defendants' conduct alleged herein demonstrates negligent disregard for Plaintiff, her health and safety, and her plight. Thus, Defendants' despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

469.  Each Defendant acted with negligent disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was being subjected to Tom Roe's abusive conduct.  Each Defendant was well aware of the propensity for abuse and violence taking place in their hotels. As a result of Defendants' conduct, Plaintiff was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness and desperation for *years.*

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

470.    Plaintiff has suffered almost two decades' worth of severe emotional distress, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with it for the rest of her life. She lacks the means and insurance to seek proper treatment.    Each Defendant's acts and omissions were a substantial factor in causing Plaintiff's severe emotional distress.

471.    As a direct and proximate result of the acts or omissions of Defendants, Plaintiff sustained severe and serious harm, including, but not limited to, severe emotional distress, all to her damage in a sum within the jurisdiction of this Court and to be shown according to proof.

472.    Due to their negligence, each Defendant is therefore liable to Plaintiff for the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the 20 years she lost since she was first sex trafficked as a teenager and the fact that she never had the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame and mental anguish of being a sex trafficking victim; and her pain, suffering and physical scars of her plight, and her extreme emotional distress and physical injuries, including, but not limited to, her knocked out teeth and broken arm.

473.    All such damages are the foreseeable and proximate result of Defendants' acts or omissions.

474.    Each Defendant's acts and omissions proximately caused Plaintiff to suffer and continue to suffer anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, such that an ordinary, reasonable person would be unable to cope with it.

475.    Plaintiff continues to have trouble obtaining work or sustaining herself financially.

476.    Each Defendant's negligent acts or omissions were a substantial factor in causing Plaintiff's severe emotional distress.

107

FIRST AMENDED COMPLAINT FOR DAMAGES                Case No. 5:24-cv-2350-AH-DTB

477.    Plaintiff's causes of action are timely under the doctrines of continuing tort tolling, disability, equitable tolling, estoppel, and under California Civil Code § 52.5(c), (d), and (e).

478.    Plaintiff seeks all compensable damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

## F.   COUNT SIX: NEGLIGENCE (ALL DEFENDANTS)

479.    Plaintiff incorporates the factual averments in this Amended Complaint as if fully set forth herein.

480.    Each Defendant, including G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors, owed Plaintiff a duty of care to take reasonable measures to ensure that she was not being subjected to sex trafficking and criminal abuse, both physical and mental abuse, on their premises.

481.    Each Defendant also owed a duty to the Plaintiff to use reasonable care to ensure the safety, care, wellbeing, and health of Plaintiff while she was on each Defendants' respective premises.

482.    Further, each Defendant's duties encompassed the hiring, screening, appointment, retention, training, or supervision of their employees that would otherwise provide a safe environment for Plaintiff at the hotels owned, operated, controlled, managed, or maintained by the Defendants at their respective premises.

483.    Each Defendant knew or should have known from the open and obvious signs that Plaintiff was a victim of sex trafficking or a victim of each Defendant's participation in a venture with Tom Roe's sex trafficking scheme.

484.    Defendants breached their duty of care to Plaintiff and were negligent, careless, or reckless for failing to protect the Plaintiff from their participation in the venture they engaged in with Tom Roe and failing to prevent Plaintiff's ordeal from continuing.

485.    Defendants knew or should have known, based on the obvious and visible signs that the Plaintiff was being abused, assaulted, controlled, manipulated, drugged, forced, coerced, and otherwise exploited—sexually or otherwise—while at the Defendants'

108

hotels.

486.   Despite the Defendants' knowledge, either actual or constructive, regarding the sexual exploitation and trafficking of Plaintiff, Defendants took no remedial action, did not conduct a good faith investigation, or did not take any other actions whatsoever to ensure the health, safety, and wellbeing of Plaintiff on the Defendants' premises.

487.   At all times relevant to this Amended Complaint, Defendants had grossly inadequate policies and procedures to protect sex trafficking victims, including Plaintiff.

488.   As a direct and proximate cause of the Defendants' negligence, whether gross, careless, or reckless, Plaintiff was sex trafficked, sexually exploited, physically abused, mentally abused, assaulted, and continually victimized at the Defendants' hotels.

489.   The actions, omissions, commissions, or lack thereof of each Defendant named in this Amended Complaint (and among them jointly and severally) constitute negligence, and said negligence as outlined in this Amended Complaint is the cause of Plaintiff's injuries and damages.

490.   Plaintiff has been injured and damaged under common law negligence, as well as all applicable state and federal laws, statutes, or regulations for negligence, due to the continual ordeal Plaintiff was forced to endure at the hands of each Defendant and Tom Roe.

491.   In addition to the general claims of negligence in this count, to the extent that any Defendant is found not to be directly liable, they are liable for Counts 1 through 6 under one or more of the following doctrines and theories of liability:

492.   **Aiding and Abetting**:

   a. Each Defendant gave substantial assistance, comfort or encouragement to Tom Roe to perpetrate his scheme and violence against Plaintiff. Each Defendant, directly or through one or more of its employees, actively took part in Plaintiff's trafficking, or furthered it by cooperating with Tom Roe, or ratified and adopted his actions so that the ventures could make money, avoid detection, and continue as a business; and

   b. Each Defendant's conduct was a substantial factor in causing harm to Plaintiff

109

and perpetuating her trafficking because without the hotels' housing, the sex trafficking would not have occurred.

493. **Respondeat Superior/Vicarious Liability:**

   a. Each of the named Defendants herein, acting through their agents or employees, are liable for the acts and omissions of their agents or employees giving rise to liability;

   b. For each of the respective Defendant hotel ventures described herein, the owners, employees and, as applicable, franchisors were the agents of each other, if not the employees of each other, and at all times were acting in the scope of their agency or employment;

   c. For the hotel employees, their tortious conduct is chargeable to the hotel owners because their acts or omissions were in the scope of their employment in a way that was inherent in their employment duties and was conduct that was a natural outgrowth of their employment duties under the risk-of-the-enterprise doctrine; and

   d. The G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors are vicariously liable for the acts or omissions of their own employees and agents, as well as their acts or omissions of their franchisees.

494. **Joint Enterprise:**

   a. The G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors are vicariously liable for the acts or omissions of their franchisees and vice versa under the theory of joint enterprise liability;

   b. The G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors (in their capacity as such) formed a joint venture with their respective franchisee hotel ventures because each intended to combine their relative property, skills, knowledge, and operations of the hotel for the purposes of carrying out a single business (namely, the franchised hotel business at issue); the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors, and each of their

110

respective franchisees had a relevant ownership interest in the franchised hotel business; the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors and their franchisee had a right to control the business—per their franchise agreements, the hotel owners/franchisees controlled the day-to-day operations while the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors controlled the macro aspects of the business, and had the right to take control of the franchised hotel business; and upon information and belief, they shared the profits and each shared losses in that they bore, at a minimum, some or all of their respective unrecouped costs if the business never made a profit; and

c. Each joint enterprise is alleged to have been made actually and by apparent authority to Plaintiff.

495. **Concerted Action**:

a. The G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors are vicariously liable for the acts or omissions of their franchisees and those franchisees' employees and agents, and vice versa under the theory of concerted action;

b. The G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors within each venture worked towards a common goal of building and maintaining the hotel business at each respective hotel;

c. Each Defendant, including the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors, knew that they were engaging in and materially assisting a sex trade operation in their hotels, which they knew or should have known could violate a duty of care owed to Plaintiff;

d. The G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors (in their capacity as such) intended to combine their relative property, skills, knowledge, and operations of the hotel for the purposes of carrying out a single business (namely, the franchised hotel business at issue); the G6 Franchisors,

111

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

the Wyndham Franchisors, and Choice Franchisors and each of their respective franchisees had a relevant ownership interest in the franchised hotel business; each of the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors and their respective franchisee had a right to control the business—per their franchise agreements, the hotel owners/franchisees controlled the day-to-day operations while the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors controlled the macro aspects of the business, and had the right to take control of the franchised hotel business; and upon information and belief, they shared the profits and each shared losses in that they bore, at a minimum, some or all of their respective unrecouped costs if the business never made a profit.

496. **Franchisor-Franchisee Negligence**: The G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors are further liable for the acts and omissions of their franchisees due to the respective negligent failure of the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors respective to (i) identify the proper operators to serve as respective franchisees; (ii) train their respective franchisees; (iii) create and implement anti-trafficking measures; and (iv) train and monitor their respective franchisees' compliance with said measures.

497. Each of G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors had control and the right to control their franchisees and intentionally did not do so with respect to identifying sex trafficking and refraining from participating in a sex trafficking venture.

498. As to each Defendant, including the G6 Franchisors, the Wyndham Franchisors, and Choice Franchisors, who contend they did not personally commit any of the acts that would give rise to liability, it is pleaded that said Defendant is liable through one or more of the above doctrines.

499. Under the above doctrines and Negligence Counts, each Defendant is liable for Plaintiff's harm.

112

FIRST AMENDED COMPLAINT FOR DAMAGES            Case No. 5:24-cv-2350-AH-DTB

500.    Each Defendant's acts or omissions under one or more of the above doctrines and theories were a substantial factor in causing harm to Plaintiff and perpetuating Plaintiff's trafficking.

501.    Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable and continuing tort tolling, estoppel, and under California Civil Code § 52.5(c), (d), and (e).

502.    Plaintiff seeks all compensable damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

## V.

## **JURY DEMAND**.

503.    Plaintiff requests a trial by jury on all issues triable to a jury.

## VI.

## **PRAYER FOR RELIEF**

504.    Plaintiff respectfully requests judgment in Plaintiff's favor awarding Plaintiff:

a.    A protective order of confidentiality and sealing and protecting Plaintiff's identity;

b.    Actual damages in an amount to be determined by the trier of fact;

c.    Compensatory damages, whether direct or indirect, in an amount to be determined by the trier of fact;

d.    Punitive damages to be determined by the trier of fact;

e.    Restitution and/or disgorgement in an amount to be determined by the trier of fact;

f.    Attorneys' fees and costs; and

g.    Any other legal or equitable relief to which Plaintiff is justly entitled.

113

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB

DATED: January 20, 2025                    Respectfully submitted,

                                           **SBAITI & COMPANY PLLC**

                                           _/s/ Mazin A. Sbaiti_
                                           Mazin A. Sbaiti
                                           CA Bar No. 275089
                                           Dallas Arts Tower
                                           2200 Ross Avenue – Suite 4900W
                                           Dallas, TX  75201
                                           T: (214) 432-2899
                                           F: (214) 853-4367
                                           E: mas@sbaitilaw.com

                                           **SBAITI & COMPANY NJ LLC**
                                           Matthew B. Sicheri
                                           NJ Bar No. 256102018 (_Pro Hac Vice_)
                                           100 Mulberry Street
                                           3 Gateway Center , Suite 1102
                                           Newark, NJ  07102
                                           T: (973) 954-2000
                                           F: (973) 954-9710

                                           **Counsel for Plaintiff**

114

FIRST AMENDED COMPLAINT FOR DAMAGES          Case No. 5:24-cv-2350-AH-DTB